## BRAY v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. May 1, 1923.)

No. 2040.

**1. Internal revenue ⬉47—Defendant's own evidence held to show assault on internal revenue officer in the performance of his duties.**

Defendant's own testimony showing that he committed an assault on one whom he knew to be an internal revenue officer engaged in the performance of his duties, because he took offense at the manner in which the officer was making his inquiries, is sufficient to show his guilt under Criminal Code, § 65 (Comp. St. § 10233), making it an offense forcibly to assault any officer of the internal revenue in the performance of his duties.

**2. Internal revenue ⬉43—Intent to impede performance of duties by revenue officer is unnecessary in prosecution for assaulting officer.**

To sustain a conviction under Criminal Code, § 65 (Comp. St. § 10233), for forcibly assaulting an internal revenue officer, it is unnecessary that the purpose of defendant in making the assault was to impede or obstruct the officer in the discharge of his duties.

**3. Criminal law ⬉95—Defendant, charged with assaulting revenue officer, cannot be convicted of simple assault in federal court.**

Where defendant was charged in the federal court with the offense of assaulting a revenue officer, contrary to Criminal Code, § 65 (Comp. St. § 10233), he could not, in that court, be convicted of a simple assault, of which the state courts alone would have jurisdiction.

**4. Criminal law ⬉1172(1)—Improper charge held not to require reversal of conviction on clear evidence.**

A charge of the judge, called forth by argument of defendant's counsel, to the effect that the prosecuting witness might be a coward, but he was not to be beaten up by a bully or a swashbuckler for that reason, and commenting on the argument that defendant was a Southern gentleman, while prosecuting witness was from Boston, although improper, *held* not to require reversal of the case, where under the evidence it would not have been possible for a reasonable man to have reached any other verdict than the one returned by the jury.

Waddill, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

---

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

R. V. Bray, Jr., was convicted of forcibly assaulting an officer of the internal revenue in the execution of his duty, and he brings error. Affirmed.

J. Waties Waring, of Charleston, S. C. (Waring & Brockinton, of Charleston, S. C., on the brief), for plaintiff in error.

Louis M. Shimel, Asst. U. S. Atty., of Charleston, S. C. (J. D. E. Meyer, U. S. Atty., of Charleston, S. C., on the brief), for the United States.

Before WOODS and WADDILL, Circuit Judges, and ROSE, then District Judge.

ROSE, Circuit Judge. [1] The plaintiff in error was the defendant below and will be so styled here. He was indicted and convicted under section 65 of the Criminal Code (Comp. St. § 10233), which, among other things, makes it an offense forcibly to assault any officer of the internal revenue in the execution of his duty. He testified in his own behalf, and no legally material fact is in dispute; his account of what took place being in every respect of any moment in law identical with that given by the witnesses for the government.

One Smith was a federal estate tax examiner and as such an officer of the internal revenue. In the discharge of his duties he came to Beaufort, S. C., to investigate the estate of one George Waterhouse, deceased. In the course of his inquiries, apparently at the invitation of one Richardson, president of the Beaufort Bank, he visited that gentleman at the latter's office and was talking to him about the estate in question, when the defendant appeared at the open door of the office. Smith, supposing that the defendant had some business with Richardson, offered to wait until the newcomer had had his interview with the bank president. Richardson, however, said that was not necessary; that the defendant was a brother-in-law of the deceased and would be interested in what Smith was doing. The defendant came in, was introduced, and the three seated themselves around a table. Smith continued his inquiries about the Waterhouse estate. All those present testified, and no one of them suggests that anything else was talked about. In the course of the conversation, a question was raised as to the rent yielded by some real estate, a one-half interest in which had belonged to the deceased. Smith seemed to both the defendant and Richardson to be disposed to cross-examine them, and to be unwilling to accept everything they said at its face value; but neither of them claims that he used any abusive language, or said anything to which exception could properly be taken. His manner, however, was irritating to the defendant. He asked Richardson what the building rented for. Richardson answered, "I could not tell you; Bray can tell us." Smith thereupon turned to the defendant and said, "What do you get for the building?" Bray replied, "Mr. Smith, I don't know that it would be any good to tell you; you don't seem to believe what I tell you; it looks as if you think that." Bray testified that thereupon Smith "rared back" in his chair and said, "I will make you tell me." Smith's own version of what he said was, "If you know the value of them [the properties], and you are the agent, I have the authority to

request how much you receive for them." Richardson's recollection is that Smith said "something about having authority," and that "somewhere about that time he plumped up and says I can make you." According to Richardson, Smith straightened up in his chair as he said "I can make you," moved his hands slightly and straightened up, and just as he did, why Bray got up and went at him, struck him. Smith went to the floor, either as the direct result of the blow, or of being thrown there by Bray, who immediately grappled with him. The two were together for an appreciable time, the defendant on top, and Smith apparently pleading with him to stop. At one stage the defendant grabbed a big arm chair and seemed about to strike Smith with it, but Richardson stopped him. Finally Smith ran into the main bank room, climbed over a screen eight feet high, and escaped. That is the story as defendant and his witness tell it. It leaves no room for question that he did what the indictment charged against him.

[2] It is earnestly urged on us, as it was upon the trial court, that he could not be convicted unless his purpose in assaulting Smith was to impede or obstruct him in the discharge of his duties, and that unless such intent existed it mattered not what the inevitable effect of that which he did was, or that the only cause of quarrel he had with the prosecuting witness was the way in which the latter discharged his official duties. The assault, in the absence of the intent in question, it is insisted, was punishable by the courts of South Carolina and by them alone, and the United States courts had no jurisdiction to deal with it in any way. We have been referred to cases arising under statutes by which a particular intent is made an element of the offense, as for example, when an intent to defraud must be shown before one may be convicted of obstructing or misapplying the funds of a national bank. Such decisions are not applicable here. The statute now under consideration forbids a forcible "assault" upon the officer "in the execution of his duty." There must therefore be an assault, as that offense is defined at common law; that is to say, there must be present the intent which the common law made an element of the crime, and the person assaulted must have been an officer then engaged in the discharge of his official duties. When he is so engaged is to be determined by common sense every day practical tests. The courts will not indulge in nice refinements which would take from the servants of the government almost all of the protection intended to be given them. In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658, 34 L. Ed. 55, and cases there cited; U. S. v. McEwan (C. C.) 44 Fed. 594.

It is not suggested that the defendant supposed himself to have any grievance against Smith, other than the manner in which the latter asked questions relating to the taxable value of the estate being inquired into. The defendant knew that Smith was a revenue officer, and as such was trying to find out what was the worth of the property in question, and it is not contended that anything said or done by Smith would, at common law, have justified an assault upon him. We are therefore relieved from any inquiry as to whether knowledge by the assailant of the official character of the person attacked and of the work in which he is engaged is an indispensable element of the offense,

or whether the existence of a provocation which at common law justified a verdict of not guilty is a sufficient defense to a prosecution under the federal statute.

[3] Under the indictment, there was no other offense of a lesser degree of which the defendant could have been convicted. The federal courts have no common-law criminal jurisdiction. "The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the court that shall have jurisdiction of the offense." U. S. v. Hudson, 7 Cranch, 32, 3 L. Ed. 259. The only federal statute providing for the punishment of common assault is found in section 276 of the Criminal Code (Comp. St. § 10449), and its application is expressly limited to assaults committed in places within either the exclusive or the admiralty jurisdiction of the United States. There is, of course, no constitutional power in Congress to prohibit or to punish assaults committed in the territorial limits of the state of South Carolina, unless they in some way interfere with the operations of the federal government.

[4] What has been said disposes of most of the assignments of error, or indeed of all of them, except those which relate to the matter or manner of the charge of the learned judge below. The defendant's own testimony amounted to an admission of every material allegation of the indictment, and the judge did not go beyond his duty when he made that fact plain to the jury. The greater part of the somewhat lengthy charge was devoted to a careful and accurate application of the law to the undisputed facts, and is not open to criticism. Before bringing it to an end the learned judge felt called upon to comment in regrettably caustic language upon some suggestions which, on behalf of the defendant in argument or otherwise, had apparently been made to the jury. They were, so far as can be judged, altogether irrelevant. To the learned judge they seemed to be attempts to induce the jurors to go counter to the law and evidence by appeals to their sympathies and their prejudices. They appear to have stressed the cowardly way in which the prosecuting witness submitted to the blows and indignities which were visited upon him, and to have called attention to the assumed fact that he was a man from Boston and the defendant a Southern gentleman. It goes without saying that such arguments, if they were made, were improper. The judge not only could, but should, have promptly stopped counsel who attempted to make them, and in some clear and positive way, have made the jurors understand that they would violate their oaths if they gave consideration to them. Instead of adopting that method, the learned judge allowed counsel to proceed and reserved his criticism for the closing passages of his charge to the jury. He first dealt with the suggestion that the defendant should not be convicted because the government official was a coward. Among other things he told the jury:

"This fellow Smith may be a coward; but a coward has a right to live and perform his duties. And he is not to be beaten up by a bully or a swashbuckler, because he is a coward."

Subsequently, and before the jury retired, he said that he did not intend to apply those epithets to the defendant. Explaining:

"I said that the argument that a man is justified in beating another under the circumstances of this case and insulting him would be to style such a one a bully and a swashbuckler."

The closing passages of the charge were:

"Argument has been made to you, gentlemen, as to the witness Smith, about his being what is called 'a man from Boston'—'a lawyer from Boston.' 'A red-blooded man,' the defendant is called; 'a gentleman resenting an insult.' No such argument as that should be addressed to a jury sworn to perform their duties in this court! No such argument! It does not matter where this man came from, he is entitled to the respect which the law gives him. It does not matter whether he is a coward. On the contrary, a brave man should respect the weakness of his brother. Now, here in this case, you were told that this other man is a gentleman. You were to consider him as a gentleman smarting under an insult. There are two sides to that for you to consider. This man Smith was sitting there. The defendant was the heavier and the bigger man. In old times, they had what was called the duel. The defendants notified each other, and each man stood up fairly in conflict. In other times, one told his antagonist to get his pistol, and the first time they met, to shoot. Ordinarily you say, 'I am going to give you a beating; put up your fists and take it!' In this case there was no sign, no word. This fellow Smith was sitting in his chair, and without a word of notice to him, the first blow struck was sufficient to disable him! Gentlemen, a rattlesnake coiled in the grass sounds his rattle before he strikes! Not only that—you may call it 'the white feather' if you wish; but here was this fellow Smith showing the white feather, pleading and begging. All he wanted to do, they say, was to get away, run—when he did once run. Is a man to be excused from a violent battery upon the theory that he beats a man who is running?

"There is no greater misuse or more shameful misapplication of the word 'Southern gentleman' than as applied to a bully who walks around with a chip on his shoulder to attack or beat a weaker human being. If he is a Southern gentleman, he has the sensibility and the knowledge to know that weakness and fear should be their own shields! You heard what followed. He went on, not only to strike him so as to disable him, but took a bleeding man, who was pleading with him, saying that he desired to explain in the performance of his duties there, that he is required to do it in the performance of his duties, and struck him again. Then he took a chair, as if he had been going to beat him with it, and slapped him again, until this poor craven wretch (if you choose to call him such; but he had the robe of the law around him!) fled, for his own protection! That is the case for you. I charge you that this man Smith, under the uncontradicted testimony in this case, was in that room there in pursuance of his duties, and that no words had passed which at law would justify a blow; none! Although, by what is called 'the unwritten law' in the South, if a man insults you grossly by telling you you are a liar, you respond with a blow—but no word of that kind had passed. And if he is a smaller man than you, if you are a Southerner and a gentleman, you don't use your strength to beat him up, when you find him incapable. Not even a dog—a dog when he is torn by his antagonist, when he lies down in the street and holds up his forepaws and whines—he leaves him alone! It is for you to say. I charge you, you are a jury sworn to execute the law. You are not to consider anything that is not allowed by law in palliation of his offense. The only thing you are to consider in this case, this man being in the discharge of his duties, is whether he was violently assaulted and interfered with in the discharge of them; and if you so find, I charge you it is your duty to find the defendant guilty. But that fact is for you."

All that by way of comment need be said on what has been quoted is that it would necessitate the reversal of the judgment below if, upon any conceivable construction of anything in the testimony, it would have been possible for a reasonable man to have reached any other ver-

dict than the one returned by the jury. Under these circumstances, the case is ruled by Horning v. District of Columbia, 254 U. S. 135, 41 Sup. Ct. 53, 65 L. Ed. 185. There, after the jury had been out for nearly or quite 24 hours, they were told that there really was no issue of fact for them to decide; that they were not warranted in capriciously saying that the witnesses for the government and the defendant were not telling the truth; * * * that it was their duty to accept this exposition of the law that in a criminal case the court could not peremptorily instruct them to find the defendant guilty, but that if the law permitted he would. The court added that the failure to bring in a verdict could only arise from the flagrant disregard of the evidence, the law, and their obligation as jurors. On an exception being taken, the judge repeated that he could not tell them in so many words to find the defendant guilty, but that what he said amounted to that. Upon this state of the record, the Supreme Court thus commented:

"The facts were not in dispute, and what he did was to say so, and to lay down the law applicable to them. In such a case, obviously the function of the jury, if they did their duty, is little more than formal. The judge cannot direct a verdict, it is true, and the jury has the power to bring in a verdict in the teeth of both law and facts. But the judge always has the right and duty to tell them what the law is upon this or that state of facts that may be found, and he can do the same none the less when the facts are agreed. If the facts are agreed, the judge may state that fact also, and when there is no dispute he may say so, although there has been no formal agreement. Perhaps there was a regrettably peremptoriousness of tone; but the jury were allowed the technical right, if it can be called so, to decide against the law and the facts, and that is all there was left for them, after the defendant and his witnesses took the stand. If the defendant suffered any wrong, it was purely formal, since, as we have said, on the facts admitted there was no doubt of his guilt. Act Feb. 26, 1919, c. 48, 40 Stat. 1181, amending section 269 of the Judicial Code."

The principle announced by the Supreme Court in the construction of the Act of February 26, 1919, is in accordance with that which has been stated and applied by this court. Sneierson v. United States (C. C. A.) 264 Fed. 268; Dye v. United States (C. C. A.) 262 Fed. 6. In the instant case, subject to criticism as the charge is, the learned judge distinctly told the jury that they had the power to acquit. As to that, he left them under no possible misconception.

Affirmed.

WADDILL, Circuit Judge (dissenting). Whether the evidence in this case be considered from the viewpoint of establishing the charge, specifically made in the indictment against the accused, of assaulting an officer in the discharge of his duty, with the intent to threaten to attack and kill such officer, or to commit a simple assault upon him, still, in either event, a careful consideration of the same will demonstrate the absence of anything like a malicious or felonious assault; and, on the contrary, what occurred was the result of a sudden outburst of passion between two strangers, arising doubtless from misunderstanding on the part of each, and from which a fisticuff of short duration, and without serious result, followed. In my judgment, the evidence shows a simple assault, which is covered by the indictment (Rev. Stat. § 1035 [Comp. St. § 1701]; Criminal Code, § 276 [Comp.

St. § 10449]), and for which, at most, a conviction should have been had, and a fine of not exceeding $100 imposed. The District Court took from the jury the consideration of the question of a simple assault, and in effect instructed them that the evidence established an assault as specifically charged with intent to interfere with and attack an officer in the discharge of his official duties. The judge likewise charged the jury in a manner and in substance claimed by the accused to be highly prejudicial to him. The jury returned a verdict of guilty, with a recommendation of mercy. The court sentenced the accused to imprisonment in the penitentiary at Atlanta for the term of one year, and to pay a fine of $1,000, with the costs of the prosecution. From this judgment, the writ of error was sued out.

It seems to me that the court was in error in taking from the jury the determination of the character of the assault committed, as it was in much of the general charge it gave. Hicks v. United States, 150 U. S. 442, 452, 453, 14 Sup. Ct. 144, 37 L. Ed. 1137; Starr v. United States, 153 U. S. 614, 624, 626, 14 Sup. Ct. 919, 38 L. Ed. 841; Hickory v. United States, 160 U. S. 408, 423, 424, 425, 16 Sup. Ct. 327, 40 L. Ed. 474. I cannot give my assent to the affirmance of a judgment that would impose upon a peaceable and orderly citizen and business man of good standing in the community in which he lived the serious consequences that would follow therefrom, for an affair of such trivial character as shown by the testimony, even when taken most unfavorably against the accused. The authorities cited by the majority, especially those of Horning v. District of Columbia, 254 U. S. 135, 41 Sup. Ct. 53, 65 L. Ed. 185, Dye v. United States (C. C. A.) 262 Fed. 6, and Sneierson v. United States (C. C. A.) 264 Fed. 268, have, in my judgment, no material bearing on this case, under its peculiar facts and circumstances.

The judgment of the trial court clearly should be reversed, and a new trial awarded.