UNITED STATES v. ANTONELLI FIRE-
WORKS CO., Inc., et al.

No. 192.

Circuit Court of Appeals, Second Circuit.

May 2, 1946.

632

FRANK, Circuit Judge, dissenting.

———◆———

See also, D.C., 53 F.Supp. 870.

William J. Maloney, of Rochester, N. Y., for appellant Antonelli Fireworks Co., Inc.

George J. Skivington, of Rochester, N. Y., for appellant Antonelli.

Charles P. Maloney, of Rochester, N. Y. (Ray F. Fowler, of Rochester, N. Y., on the brief for appellants Joseph DeRitis and Barbollo), for appellants John DeRitis, Joseph DeRitis, and Barbollo.

R. Norman Kirchgraber, First Asst. U. S. Atty., of Buffalo, N. Y. (George L. Grobe, U. S. Atty., of Buffalo, N. Y., and John M. Kelley, Jr., Sp. Asst. to Atty. Gen., on the brief), for appellee.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This appeal brings up for review a trial of charges of improper manufacture of munitions of war had upon two indictments filed in the District Court on August 25, 1943. The first indictment charged the present appellants, Antonelli Fireworks Co., Inc., Amerigo Antonelli, John and Joseph DeRitis, and Dominick Barbollo, in fifteen counts with wilfully defective manufacture of war material in violation of 50 U.S.C.A. § 103; while the second charged these same defendants and three others, Bennie Piteo, Frank Bianchi, and Angelo Costanza, in a single count with conspiracy to defraud the United States in its war effort in violation of 18 U.S.C.A. § 88.[1] Piteo and Bianchi pleaded guilty. The court consolidated the two indictments; and after a trial which lasted from May 1 to June 10, 1944, and produced a record of nearly 4,000 pages, the jury acquitted the defendants of all charges of the first indictment, but found the corporation, Antonelli, the DeRitis brothers, and Barbollo guilty as charged in the second indictment. Costanza was found not guilty. The court imposed fines upon the corporation and upon Antonelli, and sentences of imprisonment for eighteen months upon Barbollo, and for two years upon the other individuals. Their appeal seeks reversal of their convictions on the grounds of insufficiency of the evidence, errors in the conduct of the trial, and repugnancy in the verdict.

Antonelli Fireworks Co., Inc., was a family corporation, all the stock of which was owned by its president and treasurer, the defendant Amerigo Antonelli. John and Joseph DeRitis, stepsons of Antonelli,

[1] The first statute, 50 U.S.C.A. § 103— not directly in issue on this appeal, in view of the acquittal of the defendants of the charges based upon it—provides for fine or imprisonment up to 30 years for those who, when the United States is at war and with intent to injure or obstruct it in carrying on the war, wilfully make in a defective manner any war material as defined in the statute. The second statute, 18 U.S.C.A. § 88, is the well-known conspiracy statute with penalties of fine and imprisonment up to two years for those who conspire "either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose."

were superintendents of the factory; and Barbollo, husband of a stepdaughter of Antonelli, was a foreman. Although organized in 1925, its debts appear to have been consistently greater than its assets until November, 1941, when, through the Chemical Warfare Service of the Army, it obtained a contract with the United States covering, inter alia, the loading of 3,000,000 incendiary bombs at a unit price of 33½ cents, or a total of $1,005,000. This munitions contract was an immediate boon, for the government not only made an advance payment of 30%, but also provided the money for new buildings and equipment, salaries of employees, and retirement of a corporate indebtedness of roughly $15,000. Production of bombs started in February, 1942; and in July, 1942, the corporation obtained the other government contract here in question, for the manufacture of 1,000,000 M-14 incendiary grenades at a unit price of 17½ cents, or a total of $175,000. Since magnesium was not available at the time of the bomb contract, the corporation was permitted to make a substitute steel-jacket bomb, subject to the government's option to require magnesium on 30 days' notice.

Both contracts contained strict specifications of manufacture. The contract for bombs imposed the obligation of inspection primarily upon the contractor; and the grenade contract provided that invoices for materials produced should bear the certification of the contractor that the bill was accurate and the conditions in all respects complied with. The specification in both contracts with which we are here particularly concerned was that a charge of Therm-8, or incendiary mixture of specified weight, was to be loaded into the grenade or bomb, whether steel-jacket or magnesium, in four approximately equal increments, each increment to be successively consolidated.[2] Eighty per cent of the bombs were to be ordinary incendiary bombs, and twenty per cent were to be made with burster charges. On the trial, a colonel in Chemical Warfare Service, qualified as an expert on incendiary munitions, testified that the employment of separate increments was necessary to obtain a uniform center of gravity, and that the functioning of the bombs would be seriously impaired by consolidation of a lesser number of increments than called for by the specifications. He further testified that the purpose of the requirement for burster charges in 20% of the bombs was to discourage fire fighters from approaching the bombs too soon after they had fallen.

The second indictment, that on which the defendants were found guilty, charged them with conspiracy, over a period from March 1, 1942, until June 10, 1943, to defraud the United States in its prosecution of the war by defective production of bombs and grenades, by misrepresentations of the munitions to United States inspectors stationed at the plant, by employment of schemes to avoid compliance with specifications, and by presentment of false claims to the United States, as prohibited by the false-claims statute, 18 U.S.C.A. § 80. It alleged many overt acts, most of which consisted of instructions given the employees to use fewer than the required number of increments and to mismark munitions, while others were based on employment of rejected materials, clustering of defective bombs, and making of false invoices and certificates by the defendants themselves.

To support the indictment, the government relied primarily upon the testimony of employees of the defendant corporation and of government inspectors located at the plant. That there was defective manufacturing was thoroughly established; that it reached truly appalling amounts seems likewise clear. This was shown by the testimony and report of a disinterested X-ray specialist, who stated that in tests of Antonelli products, made at random and thus fairly representative of the entire output, he found that out of 777 steel-jacket bombs, only 291 contained four increments, and that out of a total of 272 magnesium bombs tested, none contained four increments and only 23 contained three increments. Similarly shocking results were reported as a result of visual testing by the Chief of the Incendiaries Branch, Chemical Warfare Service. In-

[2] In January, 1943, the number of increments required in the magnesium bombs was lowered to three.

deed, the defendants did not seriously dispute the fact of extensive misproduction, but rather contended that the deficiencies were entirely accidental and due to the sudden necessity of mass production, or that, if any criminal intent did exist, it was entirely on the part of subordinate employees.

It is quite clear, however, that the jury was justified in concluding otherwise. Two witnesses, one a government inspector and the other a plant employee, testified that they had seen Antonelli himself take rejected grenades out of their box and place them in the outgoing line of production; and five witnesses were equally positive as to observation of similar acts on the part of Barbollo or the DeRitis brothers. The testimony by plant workers that defendants had instructed them to use fewer than the specified number of increments (at times warning them to use the full number in the presence of government inspectors) and to use rejected bombs and grenades was so abundant that detailed review is impracticable and unnecessary. It is sufficient to say by way of summary that a foreman, together with two subordinate employees, testified that Antonelli personally instructed them either to use rejected material, or to omit the specified charges, or both; that five witnesses testified to receiving similar instructions from Joseph DeRitis, and two from John DeRitis. One witness stated that John DeRitis promised her a raise for turning out more work by using a deficient number of charges, and that in her presence he told the defendant Piteo to see that his instructions were carried out. Two employees testified that their production rate was literally doubled by use of an insufficient number of increments.

The verdict as to each defendant was therefore amply supported by the evidence. It is true, as defendants point out, that there were other employees who testified that they had been exhorted to produce in accordance with specifications; but questions of credibility are for the jury. There was express testimony by an impressive array of employees to support the conviction. And additional credence is afford-ed the jury's conclusion by the extent of the defective manufacturing, so great as to cast serious doubts on the asserted obliviousness of the corporate officials to what was going on, and by the further fact that they, and not the workers, who were paid by the hour, stood to gain from the fraud.

Turning, therefore, to the defendants' extensive assignment of errors as to the conduct of the trial, we dismiss at the outset their contention that the consolidation of the two indictments itself constituted reversible error. The summary of the indictments and of the testimony already given amply demonstrates the near identity of the defendants, the similarity of the offenses charged, and the necessarily overlapping nature of the evidence in support of each. The facts of the case place it well within the terms of 18 U.S.C.A. § 557, authorizing consolidation when "there are several charges against any person for the same act or transaction, or for two or more acts or transactions connected together." See United States v. Smith, 2 Cir., 112 F. 2d 83; McNeil v. United States, 66 App.D. C. 199, 85 F.2d 698; Federal Rules of Criminal Procedure, Rules 8, 13, and Advisory Committee Notes thereto. It has been repeatedly held that the question of consolidation is one for the trial court, and that its decision will be reversed only for abuse of discretion. United States v. Lotsch, 2 Cir., 102 F.2d 35, certiorari denied Lotsch v. United States, 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500; United States v. Perlstein, 3 Cir., 120 F.2d 276; Firotto v. United States, 8 Cir., 124 F.2d 532; Jarvis v. United States, 1 Cir., 90 F.2d 243, certiorari denied 302 U.S. 705, 58 S.Ct. 25, 82 L.Ed. 544; United States v. Silverman, 3 Cir., 106 F.2d 750.

We can find no abuse of discretion, but rather a wise employment of judicial economy, in the consolidation ordered here. And the joint trial was admirably conducted, for the court took great pains to keep the charges separate, summarizing to the jury each indictment and the related statutes and emphasizing the difference in proof required to support conviction in each case. True, defendants with some ingenuity assert the presence of special rea-

sons against consolidation in this case because of alleged "inflammatory elements" in the first indictment. But the other charge, that of defrauding the government in its war effort, cannot be considered devoid of emotional content in the setting of May and June, 1944; and the difference between the two can be one only of degree, not justifying the duplicating of the substantially similar evidence in separate trials. Actually the jury acted with discrimination in holding the defendants on the lesser, and more clearly proven, charge; and the defendants not only were not harmed, but were probably materially advantaged by the consolidation.

We reach a like conclusion as to defendants' vigorous contention that the court erred in denying the motion of the corporation and its president for the suppression and return of certain records which, they allege, were acquired through illegal search and seizure. It appeared from the evidence that sometime at the end of May or beginning of June, 1943, an agent of the Federal Bureau of Investigation called at the office of the Antonelli Fireworks and was granted permission by Simon, its office manager, to examine certain corporate records. Defendants' present argument as to the illegality of the search is based upon their contention that Simon was not in a position to consent on behalf of the corporation. It is difficult to see, however, how the federal agent could have obtained permission from a more proper individual, since Simon appears to have been in sole control of both the office and the records. Raine v. United States, 9 Cir., 299 F. 407, certiorari denied 266 U.S. 611, 45 S.Ct. 94, 69 L.Ed. 467. Simon himself testified that Antonelli had vested in him complete supervision of the books, and that any corporate officer would have had to obtain either his permission or that of Antonelli in order to take them. Any doubt as to Simon's original authorization, however, must be dispelled by the course of later developments, since shortly after the event in question Simon related it to Antonelli, who not only made no objection, but expressly approved his action. Since the original search was therefore not improper, there can be no objection to Simon's later pro-

duction under subpoena of the same records or of records whose existence was so discovered. The subpoena was entirely reasonable in its demands; and Simon, being in actual control of the books, was properly called upon to produce them. In re National Public Utility Investing Corporation, 2 Cir., 79 F.2d 302; In re Sykes, D.C.S.D.N. Y., 23 Fed.Cas. page 579, No. 13,707; In re Hirsch, C. C. Conn., 74 F. 928, affirmed 2 Cir., 87 F. 1005; Re Sperry's Will, 138 Misc. 549, 247 N.Y.S. 202. Its direction to him as manager of Antonelli Fireworks was entirely proper. Note, 53 A.L.R. 86, and cases cited. That he may no longer have held such office at the time of service is not significant if the books were actually in his control, since the government was entitled to force their production; and the only issue was whether the mandate therefor reached the person with power to produce them.

These and other issues were considered by the District Court on motion before trial and disposed of in a careful and discriminating opinion reported in 53 F.Supp. 870. As a matter of fact, the court did order the return of papers seized in Antonelli's house; and they are not involved here. And the court correctly pointed out that as to corporate papers the right to object was available only to the corporation. United States v. DeVasto, 2 Cir., 52 F.2d 26, 29, 78 A.L.R. 336, certiorari denied DeVasto v. United States, 284 U.S. 678, 52 S. Ct. 138, 76 L.Ed. 573. The objections to the admission of this material in evidence were restated at the trial and, after extensive testimony of Simon and the FBI agents, were again overruled. In all this there was no error, but careful consideration of the rights of the accused.

Various objections are made to the summation by the prosecuting attorney. We have examined each of these with care and feel that they are of the type described by us in United States v. Dubrin, 2 Cir., 93 F.2d 499, 506, certiorari denied Dubrin v. United States, 303 U.S. 646, 58 S.Ct. 644, 82 L.Ed. 1107, as the not unusual attempt to turn the trial of the accused into a trial of government counsel. Certainly the first objection, based upon counsel's reference to certain letters in evidence, merits little dis-

cussion. One was defendant Antonelli's letter to a district official of the Chemical Warfare Service, stating that, unless the rent for the land on which the factory stood was increased from $50 to $150, he would be sued by the owner, one Mrs. De-Ritis. The other was a letter from the contracting officer of the Service relating to Antonelli's request for $875 monthly as storage for component parts owned by the government. Counsel in summation merely brought out what had already appeared without objection in evidence, namely, that the allegedly pressing creditor of the first letter was actually Mrs. Amerigo Antonelli, DeRitis being her name from a former marriage, and that the $875 monthly storage demanded was exorbitant in view of the fact that the rent being paid by the corporation for its entire premises was $130 per month. In the light of the charges here involved, it was quite appropriate, if not important, that the evidence before the jury as to defendants' attitude towards the government, including attempts to overreach in negotiations with it, should be emphasized.

Equally unmeritorious under the circumstances here are defendants' objections to certain expressions by the prosecutor of belief in the government's witnesses and in the guilt of the accused, and that the evidence established guilt beyond a reasonable doubt. While the summations of defense counsel were not reported, part of the challenged argument here was expressly stated as a reply to an assertion of a defense attorney that government counsel knew this to be a weak case; and the context shows this to be the quite natural response to that assertion. Defendants are now in no position to complain of what was thus invited. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 241, 242, 60 S.Ct. 811, 84 L.Ed. 1129. Of course this affirmation of belief merely put into words what the very fact of prosecution implied; and its effect on the jury was therefore remote at most. Meyer v. United States, 7 Cir., 258 F. 212, 215. Moreover, any possible error was cured by the forthright charge of the court instructing the jury at the outset to disregard these remarks of government counsel, since the function of determining such questions of fact was exclusively its own.

Finally much is made of the concluding sentence of the summation: "I cherish an overwhelming confidence, ladies and gentlemen, in the belief that each one of you, after you have been instructed by the Court, will each render your verdict without malice, but without sympathy, that you will each render a verdict of which you can always be proudly justified in the presence of your fellowmen, those here at home who labor and have labored unceasingly in an honest effort to manufacture munitions of war as well as those of us beyond the seas who look to us for the things they need to sustain them in their hour of extreme sacrifice."

Immediately thereafter the court invited, indeed pressed for, exceptions from the defendants ("Do you have something to say? I was waiting for you if you had something to offer," etc.) and, when they were made, promised to take care of the matter in its charge—a course apparently completely acceptable to the defendants, for they made no other suggestion. Then the court began its charge with extended directions to the jury, made with detailed particularity, to disregard in their entirety the remarks of government counsel as to our men overseas, to eliminate any prejudice or passion which might falsely be considered patriotism, and to do its duty by making an unbiased determination of the issues. This was fully acceptable to counsel at the time, as the exceptions made at the close of the charge concerned other matters entirely. Indeed, no motion for a mistrial, or suggestion of mistrial, was ever made. The defendants' attitude in fact is naively disclosed in the corporate defendant's argument, adopted by the other defendants, to the effect that, while the court "agreed" with the objections and "did attempt to at least lessen the awful effect of this inflammatory charge," "this charge did not have the hoped for effect," because the jury still found guilt. This was in spite of the fact that the jury came in with a question carefully discriminating between the indictments and eventually found guilt only

upon the charge of defrauding the government. Hence the thought, now after the event, is that the summation was so objectionable as to be cured only by a verdict of not guilty! Moreover, the corrective charge was so sharp and complete and came so immediately after the summation as to be effective if any words of the judge could operate as a cure. The practical alternative now urged upon us is therefore quite clear; it is that these few words of the government counsel so thoroughly vitiated this long and patiently tried case that the judge could do nothing to save the situation, and that it was his duty to force a mistrial upon the parties even though it had not been requested.

Now had the judge not applied the extensive corrective measures he did, there would still be a question whether reversal would be required. Though the remarks were ill advised and overzealous, they seem insignificant when properly considered in their setting. In fact, by themselves they are no more than an admonition to the jurors to observe their oath of office and thus have the satisfaction of duty well done. They became objectionable only by association with the charge here, but that objection by association is offset by other circumstances. Thus, as government counsel had pointed out, while they had never once used the word "sabotage" and had attempted to avoid prejudice or instill in the jury "some special concern because of the war," yet the defendants had used it very much. Of course, trials in wartime are under the pressure of special emotions; but it is certainly not feasible to postpone all attempts to meet and correct defects in production as extensive as were here uncovered until the uncertain date of the war's close. That this language added anything to the natural feelings of Americans at that time is seriously to be doubted. In fact it shows little confidence in the intelligence of American jurors to imagine that these few inapt words at the end of a long trial could be an important adjunct to the prosecution's case, even had they remained unchallenged. But when the rebuke of the judge was swift and sure, there would seem no reasonable ground for attributing such emotional irresponsibility to this jury.

So far as we can discover, no case has compelled an order of mistrial, without prayer therefor, under circumstances at all comparable to this. In fact, in United States v. Socony-Vacuum Oil Co., supra, 310 U.S. 150, 237–243, 60 S.Ct. 811, 852, 84 L.Ed. 1129, the Supreme Court sustained, as "incidental statements during this long trial," not likely to influence the minds of the jurors, a much more extensive summation painting a sordid picture of a group of influential millionaires or billionaires who had taken over the power to make prices, disclosing that "a hundred lawyers," "the very cream of the American Bar," were working day and night to confuse the issues in the case for the defendants, and begging the jury not to fail the government or its highest officials who earnestly desired a conviction. So obviously the few questioned words in the present case are far from the tirade criticized in the majority opinion in Viereck v. United States, 318 U.S. 236, 247, 252, 63 S.Ct. 561, 87 L.Ed. 734—where the trial judge had overruled the objection to the argument—or the pervasive and continuous misconduct of the prosecutor, without substantial hindrance from the judge, in Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. And they are insignificant compared to the extensive and unchecked summation upheld in Ballard v. United States, 9 Cir., 152 F.2d 941, now before the Supreme Court.

Next, defendants assert error in the failure of the court to charge that the jury might draw a presumption against the United States from its failure to use at the trial certain witnesses which it had subpoenaed. All of the witnesses in question appear to have been employees at the plant with the exception of one, who was a government inspector there stationed. The prosecution produced on trial three government inspectors and a total of seventeen employees of the factory (in addition to the two defendants who pleaded guilty), some of whose testimony was in fact repetitious beyond the need for corroboration. There is not the slightest indication, nor may we indulge in any presumption, that the witnesses not called were in any better position to have observed operations at the

plant than those who were, or that their testimony would be anything more than cumulative. In such a case we have held that no adverse presumption may be drawn. De Gregorio v. United States, 2 Cir., 7 F.2d 295, 296. See also 2 Wigmore on Evidence, 3d Ed. 1940, § 287. Nor is there any reason to disagree with the court's statement that the witnesses were equally available to both sides, in which case the authorities are also clear that no unfavorable presumption may be drawn. Egan v. United States, 52 App.D.C. 384, 287 F. 958; Moyer v. United States, 9 Cir., 78 F.2d 624.[3]

■ Defendants' claim of error in the court's charge as to character evidence is perhaps their most important one, for it has some appearance of support from the precedents. Defendant Antonelli introduced six witnesses—two of them ministers, three business men, and one a minor government official—all of whom stated that Antonelli had a good reputation in regard to honesty and integrity, and two of whom also spoke as to his character. Since defense counsel made no request for a charge on character testimony, the court was not required to charge on the subject. Kreiner v. United States, 2 Cir., 11 F.2d 722, 731, certiorari denied 271 U.S. 688, 46 S.Ct. 639, 70 L.Ed. 1152; United States v. Kelley, 2 Cir., 105 F.2d 912, 918; Kinard v. United States, 68 App.D.C. 250, 96 F.2d 522. It did, however, so charge in these words: "A number of witnesses have testified here as to the reputation of Antonelli and Costanza for truth, veracity, honesty and integrity. These are known as character witnesses.

Evidence of good character is not in and of itself sufficient to raise a reasonable doubt as to the guilt of any defendant except when, in the judgment of the jury, the defendant's character is so good as to raise a reasonable doubt of the positive evidence against him." Defendants now claim that this charge constituted reversible error in the light of Edgington v. United States, 164 U.S. 361, 366, 17 S.Ct. 72, 41 L.Ed. 467. But an extensive review of the authorities has not so convinced us.

■ As we stated in Kreiner v. United States, supra, again in Nash v. United States, 2 Cir., 54 F.2d 1006, certiorari denied 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945, and more recently in United States v. Kelley, supra, all that the Edgington case holds is that the trial court must not tell the jury to consider the character evidence only when the scales are already in balance. "But if the judge avoids that pitfall, as here he did, he has as many variants among which to choose as he has in general; evidence of good character is to be used like any other, once it gets before the jury, and the less they are told about the grounds for its admission, or what they shall do with it, the more likely they are to use it sensibly." Nash v. United States, supra, 2 Cir., 54 F.2d 1006, 1007. Here the charge was cryptic and abbreviated; but it did not directly run afoul of the Edgington pitfall. It appears to have been an attempt to suggest to the jury the degree and weight of character evidence sufficient to raise a reasonable doubt, though in total effect it is hardly more than the statement of a truism.

---

[3] True, defendants attempted to show such intimidation of the witnesses by FBI agents as to make them unavailable as defense witnesses. But the evidence —which was spread on the record and obviously discounted by the jury—was rather less in amount than was to be expected in a bitter small-community battle of the sort here depicted, and was most unimpressive. It consisted of (1) the testimony of Piteo, a defendant herein who pleaded guilty, that he tried to persuade a plant employee not to testify, and of another employee that Piteo had tried to influence her similarly; (2) the affirmative answer of another employee to the inquiry whether "they"— unidentified—had not assured her that if she testified "in a certain way" she "would have nothing to fear"; (3) the testimony of Costanza, the acquitted defendant, that the agents told him they were not particularly interested in him, but wanted the "big shots"; and (4) the testimony of defendant John DeRitis that Theresa Molinari, her mother and sister refused to accompany him to the office of defense counsel because, so Theresa told him, an FBI agent had instructed her not to do so—testimony consistently denied by Theresa, under the most searching cross-examination. Moreover, her brother denied that any pressure was exerted upon him. Such trivial stuff deserved the complete ignoring which the government gave it.

The case thus differs from Oppenheim v. United States, 2 Cir., 241 F. 625, where the court expressly told the jury that the character testimony could create a reasonable doubt only if the evidence were nearly evenly balanced, and from such cases in .other circuits as United States v. Quick, 3 Cir., 128 F.2d 832, and Gold v. United States, 3 Cir., 102 F.2d 350, where the court refused to give correct charges based on the. Edgington case and requested by defense counsel; from Colbert v. United States, App.D.C., 146 F.2d 10, where the court inadvertently failed to give such a requested charge in a doubtful case where the only witness as to defendant's guilt was an accomplice; from Miller v. United States, 10 Cir., 120 F.2d 968, where the court limited the jury's consideration of character evidence to one part of the case; and from Perara v. United States, 8 Cir., 235 F. 515, where the court indulged in prejudicial remarks as to the unreliability of public opinion as to character. Indeed other circuits have gone far beyond the requirements of the present case to sustain trial courts in refusing to give the Edgington charge even when requested and merely instructing the jury to consider the evidence or to give it such weight as it saw fit. Mannix v. United States, 4 Cir., 140 F.2d 250; Haffa v. United States, 7 Cir., 36 F.2d 1, certiorari denied 281 U.S. 727, 50 S.Ct. 240, 74 L.Ed. 1144. See also Capriola v. United States, 7 Cir., 61 F.2d 5, certiorari denied Walsh v. United States, 287 U.S. 671, 53 S.Ct. 315, 77 L.Ed. 579; Baugh v. United States, 9 Cir., 27 F.2d 257, certiorari denied 278 U.S. 639, 49 S.Ct. 34, 73 L.Ed. 554; United States v. Kushner, 2 Cir., 135 F.2d 668, 674, certiorari denied Kushner v. United States, 320 U.S. 212, 63 S.Ct. 1449, 87 L.Ed. 1850.

Here, too, not only was there no request to charge as to character evidence, but the only exception taken to the charge on this point was a purely general exception "to that portion of your Honor's charge that dealt with the effect of character witnesses," by the attorney for the corporate defendant. There was no objection from the accused directly interested. And the general objection was not such as to bring home to the experienced judge the point of the exception; had it done so "it is inconceivable that he would not have made it abundantly plain at once that his language should not have been so construed or misconstrued." United States v. Bennett, 2 Cir., 152 F.2d 342, 346, now before the Supreme Court.

Defendants' final contention is that of repugnancy in the verdict. In view of the charges in each indictment, it seems to us entirely logical for the jury to have found guilt in one case and not in the other. As the trial court correctly informed it, the finding of either intent or reason to believe that their acts would deter the government in its war effort, necessary to have held the defendants guilty under the first indictment, was not essential to conviction under the second. The jury, when returning to the courtroom for further instructions, showed that this distinction was considered, for the question asked was whether, if the evidence showed no intent to hinder the war effort, but knowledge of defects, such a finding required dismissal of the first indictment. Its eventual verdict appears, then, as the product of discrimination, rather than illogic. This justification of the result, although obvious, is by no means necessary, however, since it has long been established that an appellate court will not reverse for a seeming inconsistency in the verdict. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161; Selvester v. United States, 170 U.S. 262, 18 S.Ct. 580, 42 L.Ed. 1029; United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48; United States v. Pandolfi, 2 Cir., 110 F.2d 736, certiorari denied Pandolfi v. United States, 310 U.S. 651, 60 S.Ct. 1103, 84 L.Ed. 1416.

We have thus examined with care each assignment of error by itself and apart from its connection with the entire case. For, under our system of law, defendants are entitled to a new trial, however guilty they may be, if error affecting their substantial rights has occurred in any particular. Bollenbach v. United States, 66 S.Ct. 402. And we find no such error in this record. But, further, in a trial of this length and complexity, it seems peculiarly important to consider the over-all fairness of the trial as a whole; for the ultimate

test of trial by jury is the fairness of the process, rather than the success of the result, which by hypothesis never can be known with ultimate assurance. Indeed, the Supreme Court has attempted to gauge the total effect of the trial in determining the necessity of reversal in particular instances. Thus, in United States v. Socony-Vacuum Oil Co., supra, 310 U.S. 150, 239, 60 S.Ct. 811, 852, 84 L.Ed. 1129, the Court points out that "this was not a weak case, as was Berger v. United States," supra, in holding reversal unnecessary for the summation of government counsel. And the rules of criminal procedure, which have just taken effect, preserve the statutory admonition against reversals for errors which do not affect substantial rights. Federal Rules of Criminal Procedure, rule 52(a), restating the substance of 18 U.S. C.A. § 556 and 28 U.S.C.A. § 391. This is particularly instructive because of the fact that certain members of the Advisory Committee recommended a rule of compulsion of reversal for "plain error" even though not claimed, and their suggestion was rejected by the full Committee and the Court. See Preliminary Draft of Federal Rules of Criminal Procedure, 1943, Supp. pp. 258, 262, and the final rule, rule 52(b). Here it is not necessary to apply any rule of "harmless error";[4] for the case was carefully and ably tried. As we have shown above, the evidence was as strong and persuasive as it is ever likely to be in a hotly disputed case; supported by the natural inferences to be drawn from the extensive nature of the frauds and the gain to the defendants alone therefrom, it shows the verdict to be thoroughly justified.

In the review of a criminal conviction after a long and bitterly fought trial, there is considerable incentive for reviewing judges to order reversal. It is comparatively easy to single out particular instances, which, apart from their setting in the total trial, may afford a dramatic basis for appeal to the American spirit of fair play and cherished love of personal liberty. Such an opinion writes itself, chances of reversal and reinstatement of the verdict are remote, and academic acclaim is assured. But there is a demand for what Wigmore (Evidence, 3d Ed. 1940, § 21) calls "the solid claims of law and order"; and a failure to visit with the moderate punishment here involved serious defrauding of the government in its war effort is unjust to other honest manufacturers and unfair to the endeavors of all others engaged in a common patriotic enterprise. Even an order for a new trial, and the

[4] There are assertions that this circuit has a unique rule of harmless error, unlike any other federal court. Cf. United States v. Rubenstein, 2 Cir., 151 F.2d 915, 920, certiorari denied Rubenstein v. United States, 66 S.Ct. 168; United States v. Bennett, 2 Cir., 152 F. 2d 342, 349. But the record does not bear out this contention. Not only has no such divergent rule ever been announced or assumed, but the members of this court have been scrupulous according to their lights in carrying out the announced principles of F. R. 61, 28 U.S.C.A. following section 723c, 28 U.S.C.A. §§ 391, 777, 18 U.S.C.A. § 556, and now of F. R.Cr.Proc., rule 52. Errors there may have been, of course; but they seem more like honest differences of opinion than blind intransigence. There are certainly many cases in this circuit ordering reversals beyond what Wigmore would have thought permissible or desirable in an era less sensitive to the plaints of the accused, as stated in his famous criticism of presumption of error, 1 Wigmore on Evidence, 3d Ed. 1940, § 21; and there are cases where members of this court remained in doubt. A full citation is not desirable here; instructive cases are United States v. Trypuc, 2 Cir., 136 F.2d 900; United States v. Hoffman, 2 Cir., 137 F.2d 416, 422; United States v. Andolschek, 2 Cir., 142 F.2d 503; United States v. Pape, 2 Cir., 144 F.2d 778, certiorari denied Pape v. United States, 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602; United States v. Krulewitch, 2 Cir., 145 F.2d 76, 156 A.L.R. 337; United States v. Marzano, 2 Cir., 149 F.2d 923; United States v. Haug, 2 Cir., 150 F.2d 911, 914; United States v. Ausmeier, 2 Cir., 152 F.2d 349. And in civil causes, compare Commercial Banking Corporation v. Martel, 2 Cir., 123 F.2d 846; Voltmann v. United Fruit Co., 2 Cir., 147 F.2d 514. It will not be conducive to confidence in jury trials if error is magnified entirely in one direction, so that only plaintiffs' verdicts in criminal cases and defendants' verdicts in civil causes are examined with exacting precision, while excesses of trial upon the part of other parties either are not reviewed or are overlooked.

direction to begin the work of prosecution anew, is deadening to the morale of those who have already spent years in developing a case justifying a jury verdict. Of course we must be acutely sensitive to errors affecting human rights and freedom; but there is an equal demand that the law should have its way when a long and fair trial has proceeded to its natural conclusion. We are improperly denying that demand if we say that such trivialities as are here urged—three bombastic words of a prosecutor deflated immediately by the court, a charge on character evidence which attempted to state an obvious caution, repugnancy in different verdicts as to sabotage and defrauding, etc.—offset all the patient efforts of a careful trial judge to preserve the essential attributes of a fair trial.

Convictions affirmed.

FRANK, Circuit Judge (dissenting).

1. I have no respect for the humorless self-righteous sort of person who has a firm conviction that always he alone, of the entire regiment, is in step. Accordingly, when all my colleagues (whom I consider among the ablest of judges) repeatedly arrive at a certain conclusion, my sense of humor usually downs my doubts and nudges me into acquiescence. But on the subject of "harmless error" in criminal trials, I find myself, because of the deep seriousness of the matter, unable to follow that course.[1] I am emboldened to persist in my disagreement by the fact that three times in the past few years the Supreme Court has reversed my colleagues for their views on that issue. See Berger v. United States, 1935, 295 U.S. 78, 84–89, 55 S.Ct.

629, 79 L.Ed. 1314, reversing 2 Cir., 73 F. 2d 278; Bruno v. United States, 1939, 308 U.S. 287, 293, 294, 60 S.Ct. 198, 84 L.Ed. 257, reversing 2 Cir., 105 F.2d 921; Bollenbach v. United States, 66 S.Ct. 402, reversing, 2 Cir., 147 F.2d 199.

2. As crucial facts have been omitted from or glossed over in the majority opinion, I must narrate them:

Some of the defendants are Italian-born and others of Italian descent. One of them, Antonelli, testified in a decided Italian-American jargon. American soldiers were still fighting in Italy when the case was tried. The closing arguments to the jury occurred on June 8, 1944, just after our Army's invasion of Normandy had begun. In those circumstances (and perhaps bearing in mind an ancient observation, "If you want to excite prejudice you must do so at the close, so that the jurors may more easily remember what you said.")[2] government counsel concluded his summation with this final sentence: "I cherish an overwhelming confidence * * * in the belief that * * * *you will render a verdict of which you can be proudly justified in the presence of your fellowmen*, those here at home who labor and have labored unceasingly in an honest effort to manufacture munitions of war as well *as those of us beyond the seas who look to us for the things they need to sustain them in their hour of extreme sacrifice.*" Counsel for the defendants thereupon objected to these improper remarks.

At a minimum, so the Supreme Court tells us, the trial judge, in such circumstances, "without waiting for an objection,"[3] should have promptly employed a "stern rebuke and repressive measures."[4]

[1] See my dissenting opinions in United States v. Rubenstein, 2 Cir., 151 F.2d 915; United States v. Liss, 2 Cir., 137 F.2d 995; United States v. Bennett, 2 Cir., 152 F.2d 342.

[2] Aristotle, Rhetoric, Book III, Chap. 14. See infra, note 69.

[3] Viereck v. United States, 318 U.S. 236, at page 248, 63 S.Ct. 561, 566, 87 L.Ed. 734.

[4] Berger v. United States, 295 U.S. 78 at page 85, 55 S.Ct. 629, 632, 79 L.Ed. 1314; New York C. R. Co. v. Johnson, 279 U.S. 310, 318, 49 S.Ct. 300, 73 L. Ed. 706; see also, e. g., Union Pacific

Co. v. Field, 8 Cir., 137 F. 14, 15, 16; St. Louis Smelting & Refining Co. v. Henke, 7 Cir., 277 F. 665, 667; Walker v. State, 138 Ark. 517, 212 S.W. 319, 324; Williams v. Columbia Taxicab Co., Mo.App., 241 S.W. 970, 973; O'Neill v. State, 189 Wis. 259, 207 N.W. 280, 282; cf. People v. Levan, 295 N.Y. 26, 36, 64 N.E.2d 341.

In Union Pacific v. Field, supra [137 F. 15], Judge Sanborn said: "A trial is not fair and impartial in which a discussion of irrelevant issues, a statement of a persuasive but immaterial fact, or the assertion or insinuation of

But here the judge was neither prompt nor stern, and uttered no rebuke. My colleagues are entirely mistaken when they say that he acted "immediately after the summation," applied "extensive corrective measures," gave a "rebuke" which "was swift and sure," and "deflated immediately" the words of the prosecutor. For it was not until the day after the summation —on the next morning when the jury reconvened after a recess—that he took any steps to correct the error.[4a] Then, for the

---

an erroneous view of the law or of the wrong measure of damages by counsel in his address to the jury, may have had an influence favorable to his client. The trial judge has the power, and in the first instance it is his duty, in the absence of objections by opposing attorneys, to stop and reprimand an attorney who undertakes to indulge in remarks of this nature, and, if possible, to immediately extract from the trial the vice of his obnoxious observations. And if, as is often the case, it is impossible to accomplish this, it is the duty of the court to at once discharge the jury, and to direct a new trial. * * * It is exceedingly difficult to withdraw from the minds of jurors, or from any mind, suggestions of immaterial facts, insinuations of misleading rules of action, or arguments which arouse passion or prejudice; and yet in cases in which the address of counsel conveys suggestions of this nature to the minds of the triers of the facts it is only when it is certain that these have been withdrawn that the trial is fair and impartial. It is therefore of the gravest importance that the conveyance of such suggestions to their minds should be prevented at the very threshold of the attempt, and that court and counsel should guard the jury with zealous care against all illegal, improper, or unfair arguments or suggestions."

In a leading case, O'Neill v. State, supra [189 Wis. 259, 207 N.W. 282], the court said: "When a prosecuting officer makes such statements as those here in question, no course is open to the court except to set aside the conviction. In arriving at this conclusion the court has not overlooked the fact that the trial judge directed the jury to pay no attention to the remarks of counsel. Nor have we disregarded the well-established rule that the rights of a defendant may be protected by a *prompt, vigorous, and sharp reprimand by the trial judge, coupled with an instruction to the jury to disregard the prejudicial remarks.* But even if such ruling might cure the error committed in this case (which may well be doubted), it is clear that the mild and rather indecisive ruling of the trial court in this case did not meet the requirement of the rule. The court has not overlooked the equally well-established rule that considerable latitude

must be permitted in oral argument, and that it is not always possible to restrain within narrow bounds intense zeal and the eloquent presentation of the facts of a case to a jury, and that in these matters much must be left to the discretion of the trial judge, who is in a better position to determine whether an improper statement was made under such circumstances that it might be excused, mitigated, or even justified. The case at bar stands so clearly outside the realm of these well-recognized rules as to leave no doubt as to the duty of this court. It is such statements as these that lead to mob violence outside the jury room. Such inflammatory statements must of necessity excite the same fundamental passions and prejudices, even in the minds of those who have taken an oath to well and truly try the issue submitted to them for decision in the jury room. It was the violent and unwarranted abuse of the rights of those accused of crime in England in the days when Lord Coke was prosecuting officer that led to the adoption of such safeguards for the protection of the rights of persons accused of crime as to cause Chief Justice Winslow to question whether a defendant should be permitted 'to play his game with loaded dice' and whether justice should 'travel with leaden heel.' Hack v. State, 141 Wis. 346, 352, 124 N.W. 492, 45 L.R.A.,N.S., 664. District attorneys are charged with the duties of vigorously prosecuting those who are guilty of crime. Zeal in the prosecution of offenders is always to be commended. The zeal and the fidelity with which they perform their duty will determine in large measure the degree of protection which organized society gives to its individual members. But the district attorney who permits his zeal to secure convictions to cause him to disregard his duty as a 'sworn minister of justice' not only wrongs the defendant, he impedes the administration of criminal justice and brings the administration of the criminal law into disrepute."

[4a] The prosecutor in his summation— before he came to his remarks about the "men overseas,"—had said: "Mr. Charles Maloney, ladies and gentlemen, made an observation today somewhat apart from the record. He chose to look into my mind and tell you what he thought I was

'irst time (and, contrary to my colleagues' statement, not with defendants' approv-

thinking. He said there came a time when Government counsel knew this to be a weak case. Ladies and gentlemen, I feel in view of his departure that I have a right, perhaps, to tell what was in my mind. I simply say to you that Mr. Antonelli, John DeRitis and Angelo Costanzo, Dominick Barbolla and Joseph DiRitis and the corporation are guilty of the charge which your Grand Jury had placed against them in this indictment. I say that to you solemnly, that this evidence beyond a reasonable doubt establishes that fact." He then concluded with his remarks about the juror's fellowmen including those "beyond the seas who look to us for the things that they need to sustain them in their hour of extreme sacrifice."

Thereupon this colloquy immediately occurred:

"The Court: Do you have something to say? I was waiting for you if you had something to offer now. I just wonder if you have any exceptions to note now, exceptions to remarks?

"Mr. Corbett: Yes, do it while the jury is here?

"The Court: The jury will have to be here. Do you prefer to make them without the jury?

"Mr. Corbett: I would rather.

"The Court: All right, the jury is excused until tomorrow morning at 10 o'clock.

"Mr. Skivington: I object to and except to Mr. Kelly's entire summary as inflammatory and in violation of the rights of the defendant, Amerigo Antonelli.

"Mr. Maloney: I make the same objection on behalf of the corporation, and the further objection on the grounds that his remarks in expressing his belief in the veracity of the government witnesses was also done in a manner that was inflammatory and highly prejudicial to the defendants.

"The Court: I am inclined to think you are right about that, and I think that I will say something about that in my charge.

"Mr. Kelly (the prosecutor): *I don't know as I fully understand your Honor.*

"The Court: *The point is, you expressed to the jury your belief in the testimony of the Government witnesses, and your belief that the testimony of the defendants was false, and his objection to that was that it was inflammatory.*

"Mr. Kelly: Isn't it included in the charge, that no weight is given to the opinions of counsel as expressed?

"The Court: *I think I will speak particularly about that.*

"Mr. Maloney: I wish to add also that the expression of counsel's belief in the guilt of the defendants was also prejudicial to the defendants and inflammatory.

"The Court: I agree with you as to that also, and I had previously made a note of it. I intend to speak of that in my charge."

As appears from the words I have italicized, the judge interpreted the objections thus far made, about the "inflammatory" character of the summation, to be directed solely against the prosecutor's remarks about the honesty of the government's witnesses and the falsity of defendants' witnesses. The judge, as will be seen, said he would "speak particularly about that" in his charge.

After that assurance from the judge, the colloquy continued as follows:

"Mr. Fowler: Read the closing remarks of counsel.

"(Closing comments of Mr. Kelly read.)

"Mr. Fowler: If the Court please, I except to the statement of counsel, the closing remarks of counsel, that he will expect this jury to justify their verdict before the men overseas.

"Mr. Maloney: I join in that objection.

"Mr. Maloney, Jr.: I want my objection noted. I join in that.

"Mr. Maloney, Sr.: I object to the whole last paragraph that the stenographer has read.

"The Court: That in the record does not mean anything, because it does not show what was read. You are referring in the record to the 'justification of a verdict to those overseas.'

"Mr. Maloney, Sr.: And also in the presence of the fellowmen, that whole paragraph.

"Mr. Corbett: I would like to join in the objection made, and I object to the whole summation as highly inflammatory and prejudicial, particularly on the ground that references counsel made in the summation to the boys in the service and boys in uniform as being calculated to prejudice this jury, that the remarks were highly inflammatory.

"The Court: Is there anything else? Tomorrow morning, at 10 o'clock.

"Whereupon an adjournment was taken until tomorrow morning, June 9th, at 10 o'clock."

*It will be noted, the judge did not say that his charge would include anything responsive to the objections to the "men overseas" remarks.*

al [4b]) he gave but a mild cautionary instruction, devoid of anything resembling a rebuke, stern or otherwise.[5] Thus at least some twelve hours had intervened, so that, during the jurors' overnight reflections on the case, this vicious appeal to their prejudices had had a chance to soak in, before the judge mildly counselled the jurors on the subject—and this in a case which (as I shall try to show) was by no means "strong." The inflammatory and highly prejudicial character of such a gross stimulation of such patriotic sentiments when a criminal trial is conducted in wartime has been universally recognized. See, e. g., Viereck v. United States, 318 U.S. 236, 247–278, 63 S.Ct. 561, 87 L.Ed. 734; [6] People v. Levan, 295 N.Y. 26, 35, 36, 64 N.E.

---

When the trial resumed the next day, the judge at once delivered his. charge.

[4b] See note 4a.

[5] The judge began his charge with a discussion of the prosecutor's remarks about his belief in the testimony of the government's witnesses and disbelief in that of defendants' witnesses: "At the outset, I want to refer to several remarks that were made by the attorney for the Government in his summation yesterday. In discussing the evidence of Antonelli employees who testified for the Government and, in comparing that testimony to that given by the defendants, he said that it was his opinion that the defendants had testified falsely and that the Government witnesses had told the truth. I want to instruct you now that you should disregard the expressed opinion of government counsel as to the truth of the testimony given by the government witnesses and as to the falsity of the testimony given by the defendants. The province of determining the truth or falsity of any testimony is for the jury and for the jury alone, and that province may not be invaded even by the Court and certainly not by the attorney for the Government. I do not mean to infer that it was intentionally done, but it was improper to express such an opinion, and the opinion should in no way influence your verdict.

"At the close of his remarks he expressed his solemn belief that all of the defendants were guilty of the charges set forth in the indictments against them. That also was improper. It may have been inadvertently said, but whether it was or not, it was improper for him to express his opinion as to the guilt of these defendants. The test of whether these defendants are guilty must be found in the evidence, and it would be entirely improper for you as jurors to allow your deliberation to be affected by the opinion so expressed. I instruct you now to disregard that opinion completely."

All that the judge said concerning the "men overseas" remarks of government counsel was as follows: "At the very end of his remarks he expressed a desire that the members of this jury would render a verdict in this case that would be justified before their fellowmen and before the men overseas who must look to us at home for the things necessary to sustain them in their hour of need. What some one may think of your verdict, whether that some one be a citizen at home or whether he be one of the boys overseas, should in no way influence you in your consideration of this case. There is only one way that a verdict may be justified. The test is not its popularity. The test is whether it may be justified on the evidence and on the facts as you find them and upon the law as the Court outlines it to you. I instruct you now to disregard the remarks of government counsel that I have just referred to and that you should in no way allow them to influence your verdict. You are about to commence your deliberations in this case to determine the guilt or innocence of these defendants. This is an important case from the Government's standpoint, but it is also of great importance to these defendants, because they stand here charged with a serious crime. I think it is a matter of common knowledge that in time of war there is a tendency on the part of many people to view everything that touches the war effort with a feeling of intense passion and to reach conclusions rashly with the thought in mind, perhaps, that this zeal on their part will help win the war. This is sometimes thought to be patriotism, but analysis reveals it to be far from that. We would do our Government a dis-service if we allowed the hysteria of war to usurp the place of calm deliberation in deciding this case, and we would do these defendants a great injustice. You, as jurors, should approach your deliberation in this case with a firm determination that your verdict, whatever it may be, will be reached and will have its foundation on the evidence or on inferences that may be fairly and reasonably drawn from the evidence, and that your verdict will in no way be influenced by any other consideration."

[6] There the Court said (318 U.S. at

2d 341; and see the cases dealing with criminal trials during World War I.[7] Never before has any court said what my colleagues say here—that such deadly remarks were "no more than an admonition to the jurors to observe their oath of office and thus have the satisfaction of duty well done." Nor heretofore has any court deemed such remarks harmless because compressed into a single sentence,[8] for experience teaches that a poisonous suggestion of that kind needs no elaboration. As I shall show below, the courts have frequently held that this type of error cannot be eradicated by a cautionary instruction or even by an immediate severe censuring of offending counsel. For these reasons I think this error was so markedly harmful that it requires reversal for a new and fair trial. On that ground I dissent.

A "strong" case has been defined as one in which the evidence of guilt is "overwhelming," Berger v. United States, 295 U.S. 78 at 89, 55 S.Ct. 629, 79 L.Ed. 1314.[9] In an Appendix to this dissent I have stated in some detail some of the significant evidence to which my colleagues have but sketchily and quite inadequately referred; it will there be seen, not only that the jury could reasonably have found defendants not guilty, (i. e., could reasonably have concluded that the defective work was due not to fraud but to the inexperience and incompetence of Antonelli, the other defendants, and the employees) but also that among the government's important witnesses were self-confessed accomplices and —more important—that there was considerable testimony, much of it uncontradicted, that government agents had practiced intimidation of witnesses. I therefore say that the government's case was not "strong." The courts recognize the unreliability of accomplices' testimony [9a] and have often declared that a party's intimidation of witnesses is a "badge of the weakness" of his case. Wigmore, Evidence § 278, says: "It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one, and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not apply itself necessarily to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause * * * As the general principle applies in common to all these forms of conduct, it is not necessary, nor is it usually possible, to discriminate the precedents that apply it in one or another form. Roughly classifying them, they admit all forms of personal falsification by the party in the course of the litigation; fabrication or manufacture of evi-

---

page 248, 63 S.Ct. at page 566, 87 L. Ed. 734): "At a time when passion and prejudice are heightened by emotions stirred by our participation in a great war, we do not doubt that these remarks addressed to the jury were highly prejudicial, and that they were offensive to the dignity and good order with which all proceedings in court should be conducted. We think that the trial judge should have stopped counsel's discourse without waiting for an objection."

[7] Hall v. United States, 4 Cir., 256 F. 748, 752; August v. United States, 8 Cir., 257 F. 388, 393; Elmer v. United States, 8 Cir., 260 F. 646, 649; People v. Esposito, 224 N.Y. 370, 373, 121 N.E. 344.

[8] See, e. g., the remarks of government counsel in People v. Levan, 295 N.Y. 26, 36, 64 N.E.2d 341, which I shall quote later.

[9] See also the cases cited in notes 12 and 12a, infra.

[9a] While the testimony of accomplices will sustain a verdict, the fact that the judge should instruct the jury to accept it with caution—Holmgren v. United States, 217 U.S. 509, 524, 30 S.Ct. 588, 54 L.Ed. 861, 19 Ann.Cas. 778; Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442, L.R.A.1917F, 502, Ann.Cas.1917B, 1168—serves to show that a case resting on such testimony is "weak." Berger v. United States, 295 U.S. at page 89, 55 S.Ct. 629, 79 L.Ed. 1314; Arnold v. United States, 10 Cir., 94 F.2d 499, 501, 508; cf. Nanfito v. United States, 8 Cir., 20 F.2d 376, 379; Jones v. United States, 53 App.D.C. 138, 289 F. 536, 539.

dence, by forgery, bribery, subornation, and the like; suppression of evidence, by *intimidation,* eloignment, or concealment *of witnesses* or material objects * * *" Usually in criminal cases that rule has been applied to defendants. But it applies to the government as well. United States v. Graham, 2 Cir., 102 F.2d 436, 442.[10]

3. As, of course, no court knows what influenced a particular jury's verdict of guilt in any particular case,[11] there are three possible alternative positions with respect to "harmless error." The first is that every error is harmful; no court today takes that position. The second— which is that of the Supreme Court, of most of the circuit courts and of the English courts—may be summarized thus: An error (except as to "formal matters" i. e., those which involve the "mere etiquette of trials * * * and minutiae of procedure")[11a] is presumed to be prejudicial (i. e., improperly to have induced the verdict); but this presumption is rebutted if the evidence is so "strong" that no sensible jury, had there been no error, would conceivably have acquitted,[12] as for instance where the defendant in his testimony in effect admits his guilt.[12a] In other words, when there is substantial error the appellate court will not affirm merely because the jury, if it believed the government's witnesses and disbelieved defendant's, could reasonably have inferred that defendant was guilty; it will affirm only if, had no error occurred, the jury could not reasonably have reached a different verdict, and will reverse "if, upon any conceivable construction of anything in the testimony, it would have been possible for a reasonable man to have reached any other verdict than the one returned by the jury." [12b]

As I have said elsewhere, [13] this rule does not work automatically, for some limited conjecture is unavoidable; [14] but this rule does severely restrict the area of conjecture.[15] It means that the judges do not themselves decide the issue of guilt, do

---

[10] See also Venable v. State, 84 Tex. Cr.R. 354, 207 S.W. 520; Campbell, J., in People v. Hall, 48 Mich. 482, 12 N.W. 665, 668, 42 Am.Rep. 477; cf. Weiss v. United States, 308 U.S. 321, 330, 331, 60 S.Ct. 269, 84 L.Ed. 298; Lewis v. United States, 5 Cir., 4 F.2d 520, 522; Hudson v. Commonwealth, 220 Ky. 582, 295 S.W. 886; Davis v. State, 200 Ind. 88, 161 N.E. 375, 380.

[11] Indeed, generally the courts are forbidden to learn. McDonald v. Pless, 238 U.S. 264, 267, 268, 35 S.Ct. 783, 59 L. Ed. 1300; Hyde v. United States, 225 U. S. 347, 382–384, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614; Fabris v. General Foods Corporation, 2 Cir., 152 F.2d 660; 8 Wigmore, Evidence (3d ed. 1940) 668, 677.

The general verdict "throws its mantle of impenetrable darkness over the operations of the jury." Sunderland, Verdicts, General and Special, 29 Yale L. J. 253, 260 (1919).

[11a] United States v. River Rouge Co., 269 U.S. 411, 421, 46 S.Ct. 144, 70 L. Ed. 339; Bruno v. United States, supra [308 U.S. 287, 60 S.Ct. 200].

This category includes errors which, in various ways, are "cured" and errors involving immaterial, insubstantial, matters.

[12] See, e. g., Horning v. District of Columbia, 254 U.S. 135, 41 S.Ct. 53, 65 L. Ed. 185; Bray v. United States, 4 Cir., 289 F. 329, 333, 334; Sneierson v. United States, 4 Cir., 264 F. 268, 275; Hobart v. United States, 6 Cir., 299 F. 784, 785; Guy v. United States, 71 App.D.C. 89, 107 F.2d 288, 290; cf. Pasqua v. United States, 5 Cir., 146 F.2d 522, 523, 524; Rice v. United States, 10 Cir., 149 F.2d 601, 604. Other such cases will be cited infra.

[12a] See Motes v. United States, 178 U.S. 458, 475, 476, 20 S.Ct. 993, 44 L.Ed. 1150; United States v. Domres, 7 Cir., 142 F. 2d 477, 479; Simmons v. United States, 6 Cir., 300 F. 321; cf. State v. Gilstrap, 205 S.C. 412, 32 S.E.2d 163, 165, 166.

[12b] Judge Rose in Bray v. United States, 4 Cir., 289 F. 329, 333, 334. See also cases cited in note 12.

[13] See my dissenting opinion in United States v. Rubenstein, 2 Cir., 151 F.2d 915, 919 at page 924.

[14] Just as reasonable judges may differ as to when a verdict should be directed, or as to the correct application of the "reasonable man" test in negligence cases, so they may differ as to what a reasonable jury would have done if no error had been committed.

[15] Here, as in many other contexts, it is necessary, as Holmes often pointed out, to draw a line, the precise location of which, unavoidably, is arbitrary. See Holmes, The Common Law (1881) 68, 110, 127; Holmes, Law in Science—Science in Law, 12 Harv.L.Rev. (1899) 443, reprinted in Holmes, Collected Legal Papers (1920) 210, 232–233; Hudson Coun-

not consider the credibility of the witnesses, do not invade the jury's province.

Necessarily, an upper court which does not employ either of these rules employs—either explicitly or tacitly—one which involves its own determination of the defendant's guilt or innocence, although the testimony is in conflict and the court has not heard and seen the witnesses. Such a court will hold an error "harmless" if its judges believe, from their study of the printed record, that defendant is guilty, regardless of whether those judges are convinced that the evidence is such that, absent the error, a reasonable jury which heard the witnesses would indubitably have rendered a verdict against defendant. In a court which proceeds on that doctrine of harmless error, the judges decide against the defendant, not by affirming a jury's verdict on the record which was presented to the jury, but on a markedly different record—one from which the error has been elided. The judges of such a court impliedly say in effect: "To be sure, the matter erroneously injected into the case when it was before the jury may have diverted the jury from a consideration of the properly admitted evidence and may have persuaded the jurors to find defendant guilty without regard to whether they believed the government's witnesses and disbelieved defendant's. But no one can tell that that is true, and we will not disturb a conviction on mere guesswork. So we use a different approach: We have read the record, and, while we did not observe the witnesses, and therefore lack the accepted means of determining credibility, we believe the testimony of those witnesses called by the government. We do not know, of course, whether, had we been present at the trial, we would so have believed; but we must do the best we can in dealing with such a conjectural subject. Accordingly, we hold that defendant is guilty, and consequently conclude that it is unimportant whether in actual fact (which is unknowable) the improper matter, rather than the evidence, induced the jury's verdict." The use of that doctrine means that the appellate judges are returning their own verdict, independent of (although preceded by) the jury's,[15a] and founded on a record other than that which the jury considered; for the judges are able to and do disregard the improper matter, but it is impossible to know that the

ty Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828, 14 Ann. Cas. 560; Irwin v. Gavit, 268 U.S. 161, 168, 45 S.Ct. 475, 69 L.Ed. 897; Superior Oil Co. v. State of Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed. 504; Empire Trust Company v. Cahan, 274 U.S. 473, 478, 47 S.Ct. 661, 71 L.Ed. 1158; Haddock v. Haddock, 201 U.S. 562, 631, 632, 26 S.Ct. 525, 50 L.Ed. 867, 5 Ann.Cas. 1; Schlesinger v. State of Wisconsin, 270 U.S. 230, 241, 46 S.Ct. 260, 70 L.Ed. 557, 43 A.L.R. 1224; Louisville Gas & Electric Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 72 L.Ed. 770; Quaker City Cab Co. v. Commonwealth of Pennsylvania, 277 U.S. 389, 403, 48 S.Ct. 553, 72 L.Ed. 927; Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 57 L.Ed. 1232; Bullen v. State of Wisconsin, 240 U.S. 625, 630, 631, 36 S.Ct. 473, 60 L. Ed. 830.

It is of interest that independently, and indeed apparently even before Holmes, the English courts have made similar observations. In Hobbs v. L. & S. W. Ry. (1875) L.R. 10 Q.B. 111, 121, Blackburn, J., remarked concerning the rule in Hadley v. Baxendale, "It is a vague rule, and as Bramwell, B. said, it is something like having to draw a line between night and day; there is a great duration of twilight when it is neither night nor day; but on the question now before the court, though you cannot draw the precise line, you can say on which side of the line the case is." Chitty, J., said in Lavery v. Pursell, 1888, 39 Ch.D. 508, 517, "Courts of Justice ought not to be puzzled by such old scholastic questions as to where a horse's tail begins and where it ceases. You are obliged to say, 'This is a horse's tail,' at some time." See also Mayor of Southport v. Morriss, 1893, 1 Q.B. 359, 361; Atty. General v. Brighton & Hove Cooperative Supp. Association, 1900, 1 Ch. 276, 282; Dashwood v. Magniac, 1891, 3 Ch. 306, 364; Boyse v. Rossborough, 1857, 6 H.L.C. 1, 45. For an interesting discussion, see Williams, 61 L.Q.Rev. (1945) 179, 183–185.

[15a] The peculiarity of this appellate judges' verdict is that it cannot be rendered unless, as a condition precedent, the jury has returned a verdict of guilt. But it is nevertheless independent of the jury's, i. e., reached by a different process.

jury did.[15b] Since the appellate judges' verdict rests on printed testimony, the result is a juryless "trial by affidavits."[15c] Such a doctrine, which does indeed compel extensive judicial guesswork, is inescapable for a court which rejects both the other two positions described above.

It is this third doctrine which (with certain exceptions, noted in the Appendix hereto, but not pertinent here) has been heretofore adopted by my colleagues and which they apply here.

Their position is illuminated by their decision in a recent case, United States v. Mitchell, 2 Cir., 137 F.2d 1006, 1010, in which the testimony was in conflict, and in which they held harmless unfairness towards the defendant on the part of the trial judge. There my colleagues refused to reverse because they concluded that the case was "strong," although that conclusion turned on my colleagues' opinion as to the credibility of the witnesses. On rehearing—138 F.2d 831—a revised transcript of the trial court's record disclosed the inaccuracy of important "facts" on which my colleagues had previously based their views as to the "strength" of the case. My colleagues nevertheless adhered to their former decision, although no one reading the revised version of the facts (set forth in 138 F.2d at pages 832, 833) could possibly say that a jury would have been at all unreasonable had it acquitted. Obviously when my colleagues said that that case was "strong," they meant no more than that, without themselves observing the witnesses, they believed defendant guilty.

And so in the case at bar where, again, the testimony is in conflict: Referring to one of defendants' contentions, my colleagues say that "the jury was justified in concluding otherwise." They state that the verdict "was amply supported by the evidence," since "questions of credibility are for the jury." They conclude that "the evidence was as strong and persuasive as it is ever likely to be in a hotly disputed case," and that, "supported by the natural inferences to be drawn," the verdict was "thoroughly justified." Such expressions would be entirely appropriate if there had been no error in the course of the trial and if the issue were whether there was sufficient competent evidence to support the verdict, for then the question would be whether the court could say that no jury could rationally have found defendants guilty. But such expressions are not appropriate where (as here) the court is called on to determine whether, in a "hotly contested case," turning on "questions of credibility," it may properly hold that, if

---

[15b] In United States v. Rubenstein, 2 Cir., 151 F.2d at page 922, I said: "To be sure, some lawyers maintain that only through such a judge-made device can the jury-system be made 'workable.' But such a device makes the jury system workable —by not working it. (Strangely, those lawyers who endorse this judicial circumvention of the Constitution on the ground of practicality are, in general, those who freely criticize the administrative agencies as 'usurpers'; those lawyers would cry out indignantly were any such agency to rely on that ground to justify itself in evading a statutory requirement.) If any judges happen to regard as 'impractical' the constitutional obligation to give a defendant a jury trial, they should not, by indirection, amend the Constitution. They should frankly state their position and invite our citizens to bring about a constitutional amendment in the manner prescribed by the Constitution. * * * It is important to differentiate between specific constitutional provisions and those which deliberately employ vague phrases such as 'due process.' The latter, unlike the former (such as the jury-trial provision), justify—indeed compel—liberal and developing judicial interpretation. See, as to this differentiation, United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234, note 4; United States v. St. Pierre, 2 Cir., 132 F.2d 837, 840, 847 [147 A.L.R. 240]. The jury-trial provision does not preclude all elasticity in construction; see Ex parte Peterson, 253 U.S. 300, 309, 310, 40 S.Ct. 543, 64 L.Ed. 919. But it surely does not authorize a construction which, in effect, eliminates the function of a jury's verdict of guilt except as a preliminary to a verdict by appellate judges based upon a record significantly different from that considered by the jury."

[15c] Cf. Arnstein v. Porter, 2 Cir., 154 F.2d 464.

no error had occurred, no jury could rationally have found the defendants innocent.

To restate the point: In this, as in other "harmless error" cases, my colleagues have lost sight of a distinction—which I think must be made—between the function of a reviewing court when (1) the issue is whether the verdict is against the weight of the evidence and (2) when the issue is whether an error (such as, e.g., erroneous admission of evidence or misconduct of counsel) is "harmless." Because they have repeatedly ignored this distinction, I think it desirable (at the cost of some repetition) to dwell on it:[16] In a case where no prejudicial evidence has been received and where no misconduct of government counsel has occurred, if a defendant asks an upper court to reverse his conviction on the sole ground that the record evidence is such that no reasonable jury could have found him guilty, the judges are compelled to resort to a sort of fiction: Since they were absent from the trial and since the credibility of the witnesses is a question for the jury, the judges, perforce, must assume it to be true (whether or not it is true in fact) that all the testimony pointing to guilt was given by honest, reliable, credible witnesses and that all other testimony was not. That assumption (a fiction, an "as if") in such a case is unavoidable; therefore necessary; therefore proper. Be it noted, however, that, in such circumstances, the judges at least have before them, although in printed form, the identical matter—neither more nor less—which had been presented to the jury. But that assumption (fiction) is not necessary and is therefore, I think, improper, when the record contains prejudicial evidence improperly admitted, or remarks of counsel improperly made. For the issue on appeal is then not whether, making that assumption and on the very same record which was before the jury, the jury reasonably found against defendant. If, in a case like this, the judges conclude that defendant is guilty, they reach that conclusion by ignoring important matter which had been presented to the jury and which may well have led to its verdict. In those circumstances, the judges decide against defendant, not by affirming a jury's verdict on the record which the jury had before it, but on a strikingly different record.

My colleagues' doctrine runs directly contrary to the rule enunciated in an opinion delivered by Mr. Justice Miller where (answering a contention that an error in admitting evidence did no harm because "There is enough found in the record to show that the verdict was right, if it had been excluded"), he said for the Court: "The case must be such that this court is not called on to decide upon the preponderance of evidence that the verdict was right, notwithstanding the error complained of."[16a] That was a civil case; it goes without saying that the rule should be at least as favorable to a defendant in a criminal suit.

My colleagues, however, assert that such a rule is today outmoded: Recently, in United States v. Liss, 2 Cir., 137 F.2d 995, 999, they said that there is a "modern disposition to assume that an error has been harmless * * *." As I have pointed out elsewhere,[17] that view is opposed to the current rulings of the Supreme Court and of the other circuits.[18] I think that

---

[16] See my dissent in United States v. Rubenstein, 2 Cir., 151 F.2d 915 at pages 921, 922.

[16a] Smith v. Shoemaker, 17 Wall. 630, 639, 21 L.Ed. 717; see also Crawford v. United States, 212 U.S. 183, 204, 29 S. Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392; Farris v. Interstate Circuit, 5 Cir., 116 F. 2d 409, 412; National Masonic Association v. Shryock, 8 Cir., 73 F. 774, 781.

[17] See my dissenting opinions in United States v. Rubenstein, 2 Cir., 151 F. 2d 915, 919, at pages 924, 925, and in United States v. Bennett, 2 Cir., 152 F.2d 342, 346 at pages 349, 350.

[18] Bruno v. United States, 308 U.S. 287, 294, 60 S.Ct. 198, 84 L.Ed. 451; McCandless v. United States, 298 U.S. 342, 347, 348, 56 S.Ct. 764, 80 L.Ed. 1205; Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548, 89 L.Ed. 495, 156 A. L.R. 496; Little v. United States, 10 Cir., 73 F.2d 861, 866; Lynch v. Oregon Lumber Co., 9 Cir., 108 F.2d 283, 285, 286; Fort Dodge Hotel Co. v. Bartelt, 8 Cir., 119 F.2d 253, 259; Worcester v. Pure Torpedo Co., 7 Cir., 127 F.2d 945, 947, 948; Farris v. Interstate Circuit, 5 Cir., 116 F.2d 409, 412; Evansville Container Corporation v. McDonald, 6 Cir., 132 F.2d

Bollenbach v. United States, supra, confirms my position. There the Supreme Court said that the question is not whether the appellate judges have the belief, "engendered by the dead record," that defendants are guilty, "but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials in the federal courts." [66 S. Ct. 406.][19] When the Supreme Court in Bollenbach's case declared that it is wrong to presume "all errors to be 'harmless' if only the appellate court is left without doubt that one who claims its protective process is, after all, guilty," it was not speaking at large, but was engaged in reversing this court; that serves, I believe, to show that the Supreme Court thinks, as I do, that my colleagues, in cases where the testimony is in conflict, erroneously rest their decisions as to harmless error on their own belief in a defendant's guilt or innocence.[20]

Decisions of the English courts, recently cited with approval by the Supreme Court in Bollenbach's case, are instructive. In each of the following cases thus cited, the Court was requested to affirm a conviction pursuant to a statute (§ 4 of the Criminal Appeals Act of 1907[21]) much like our own "harmless error" statute.[22] In Maxwell v. The Director of Public Prosecutions, [1935] A.C. 309, defendant had been improperly asked about a previous prosecution for another crime of which he had been acquitted; the court in reversing, said, "It is impossible to deny that the evidence was strong against him," as defendant had made "very damaging admissions," but it was not certain what the jury would have decided, had the question not been asked. The court concluded thus: "If in any case the evidence against a prisoner (other than that which is inadmissible) is very strong and is abundant to justify a jury in convicting, it may well seem unfortunate that a guilty man should go free because some rule of evidence has been infringed by the prosecutor. But it must be remembered that the whole policy of English criminal law has been to see that as against the prisoner every rule in his favour is observed and that no rule is broken so as to prejudice the chance of the jury fairly trying the true issues. The sanction for the observance of the rules of evidence in criminal cases is that, if they are broken in any case, the conviction may be quashed * * * It is often better that one guilty man should escape than that the general rule evolved by the dictates of justice for the conduct of criminal prosecutions should be disregarded and discredited." In Rex v. Dyson, [1908] 2 K.B. 454, where an improper instruction was given, the court reversed although it felt that the jury, if it had been given a proper instruction, "would in all probability have found the defendant guilty," saying that the statute (as to "substantial miscarriage of justice") was "intended to apply to a case in which the evidence is such that the jury must have found the prison-

---

80, 85; Ah Fook Chang v. United States, 9 Cir., 91 F.2d 805, 810.

[19] In my dissenting opinion in United States v. Rubenstein, supra, 151 F.2d at page 922, I said that in this circuit even if erroneously received evidence "was such that it may well have affected the jury's verdict, yet it is no ground for reversal if my colleagues believe the defendant guilty. The rule in this Circuit thus boils down to this: If the jury, on the basis of certain evidence, has brought in a verdict of guilt, then, on quite different evidence (i.e., different because the judges delete prejudicial evidence) the judges may render their own independent verdict of guilt, despite the fact that they neither saw nor heard the witnesses on whose testimony they rest their verdict. In so doing, the judges convert themselves into a jury. By thus substituting themselves for the legal-ly authorized jury, I think they exercise a power beyond their legitimate—their constitutional—scope. Without warrant in statute or Constitution, the judges find the facts. I cannot believe that such a procedure satisfies the constitutional requirement of a jury trial. The defendant has been convicted by the judges, not by a jury. He has been unconstitutionally deprived, I think, of the privilege of a trial by jury fully as much as if, in the first instance, he had been compelled to go to trial before a juryless court."

[20] Subject to the exceptions noted in the Appendix hereto.

[21] A proviso in § 4 of that Act authorizes dismissal of an appeal if the court considers that, despite error, "no substantial miscarriage of justice has actually occurred."

[22] 28 U.S.C.A. § 391.

er guilty if they had been properly directed." [23] The following English cases, in each of which the trial court erred in its directions to the jury, are also pertinent: In Woolmington v. The Director of Public Prosecutions, [1935] A.C. 462, 482–483, the conclusion was, "We cannot say that if the jury had been properly directed they would inevitably have come to the same conclusion." In Rex v. Lewis, 31 Cox Cr. L.Cas., 19, 22–23 (Ct. of Crim.App., 1937), the test was said to be whether "the conclusion is not to be resisted, that the jury, properly directed, would certainly have arrived at the same conclusion." In Rex v. Haddy, 1944, 1 K.B. 442–446, the Court used the test that "no reasonable jury properly directed would, or could, have come to any other conclusion than that to which they did come." In Stirland v. Director of Public Prosecutions, [1944] A.C. 315, 321, the test used was whether a "reasonable jury, after a proper summing up, could have failed to convict," or would "without doubt convict."[24] Our Supreme Court's formulation is virtually the same.[25]

The reason for this rule is obvious: "It is seldom possible with even moderate competence to conjecture solely from perusal of a written or printed record whether or not a defendant is guilty. As the judges of an appeal court have not heard or seen the witnesses, they have no reasonably adequate way of judging whether any of the witnesses lied or—because of unconscious bias or faulty memory—testified with inadvertent inaccuracy." [26]

Most (not all) of the precautionary and exclusionary rules have derived from, or have been perpetuated because of, the recognition of the untrained capacity of ju-

---

[23] In Rex v. Redd, 1923, 1 K.B. 105, a witness was asked whether he knew that the defendant had been previously convicted and answered in the negative; no further reference to this matter was made before the jury. The court reversed, although it said that defendant's wife "gave most damning evidence against him," remarking, "It is impossible to suppose that the jury were not influenced by the questions put to the witness * * * even though the witness did not assent to such questions * * * *"

[24] See also Rex v. Turner, 1944, 1 K.B. 463, 471; Rex v. Beecham, 1921, 3 K.B. 464, 468–472; Rex v. Fisher, 1910, 1 K. B. 149, 153; Rex v. Norton, 1910, 2 K.B. 486, 501.

[25] In McCandless v. United States, 298 U.S. 342, 347, 56 S.Ct. 764, 766, 80 L. Ed. 1205, the Court said that the "harmless error" statute "does not change the well-settled rule that an erroneous ruling which relates to the substantial rights of a party is a ground for reversal unless it affirmatively appears from the whole record that it was not prejudicial" (citing United States v. River Rouge Co., 269 U. S. 411, 421, 46 S.Ct. 144, 70 L.Ed. 339; Fillipon v. Albion Vein Slate Co., 250 U. S. 76, 82, 39 S.Ct. 435, 63 L.Ed. 853; Williams v. Great Southern Lumber Co., 277 U.S. 19, 26, 48 S.Ct. 417, 72 L.Ed. 761.) In Bruno v. United States, 308 U.S. 287, 293, 294, 60 S.Ct. 198, 200, 84 L.Ed. 257, the Supreme Court said that this statute was intended "to prevent matters concerned with the mere etiquette of trials and with the formalities and minu-

tiae of procedure from touching the merits of a verdict."

In Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 551, 89 L.Ed. 495, 156 A.L.R. 496, the Court cited the Bruno case with approval and said, "We are not authorized to look at the printed record, resolve conflicting evidence, and reach the conclusion that the error was harmless because we think the defendant was guilty. That would be to substitute our judgment for that of the jury and, under our system of justice, juries alone have been entrusted with that responsibility."

In Bollenbach's case, supra, the Court said: "In view of the place of importance that trial by jury has in our Bill of Rights, it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be."

[26] Dissenting opinion in United States v. Rubenstein, 2 Cir., 151 F.2d 915 at 920, 921. There I added: "Observation of the witnesses' demeanor is by no means an infallible method of determining the accuracy of their testimony. But, no perfect method having been devised, such data are of considerable value. The printed record necessarily omits such data. The testimony of a glib liar may show up in print far more persuasively than that of an honest, cautious witness. Perhaps, if on appeals we used records consisting of talking motion pictures of trials, this particular difficulty could be largely overcome."

rors; for that reason, departures from those rules are usually not error when a trial judge sits without a jury (e.g., reception of inadmissible evidence when there is other competent evidence to sustain the judgment). But if in a jury trial in a criminal suit (a) there has been a violation of any of these rules—designed to keep from the jurors matter which might improperly influence them against the defendant—and (b) the verdict is adverse to him, and (c) the evidence is not such that, had that rule not been violated, a reasonable jury would unquestionably have reached the same verdict, then, unless the verdict is set aside, the very purpose of the rule is frustrated. *The point is that, if such a violation is* held harmless, the rule has been abandoned, and the jury has been subjected to influences recognized, in the judicial adoption of the rule, as unfair to the defendant. In sum, unless the rule is senseless and should never have been adopted, the defendant has not received a fair trial.

4. Applying the usual "harmless error" doctrine, the courts generally hold that improper remarks (or other similar misconduct [27]) of counsel will be deemed to have induced the verdict (Berger v. United States, 295 U.S. 78, 85–89, 55 S.Ct. 629, 79 L.Ed. 1314 [28]) and to require reversal. For such remarks may affect the jury even more than erroneously admitted evidence.[29] Close students of the subject,

---

For typical judicial comments on the importance of seeing and hearing the witnesses, see quotations in Arnstein v. Porter, 2 Cir., 154 F.2d 464; Moore, Facts (1898) §§ 963, 967, 991–995.

A writer who knows much of jury trials reports as follows: "Perjury, error and direct conflicts in testimony and in argument are present in every trial, and the mere words in black and white seldom tell as complete a story as is told by the words when combined with the actions and appearance of the live actors in this interesting drama. Let us imagine that every spoken word in a trial is all correctly written out, and then all read by the jury, or *read to the jury or the judge. Is there anyone so foolish as to say that a wrong decision would not be more likely in the absence of the living witnesses and speakers?* * * * The most skilful official stenographer could not write down all of the varied influences that appeal to [the jury]. The witnesses speak and the lawyers speak but not by words alone. Many *of these speakers are eloquent in other* ways, sometimes to their detriment and sometimes to their advantage. Their faces and their changing expressions may be pictures that prove the truth of the ancient Chinese saying that a picture is equal to a thousand words * * * Unconsciously we all tell about ourselves certain things by our actions and our general appearance. This language of others *it becomes necessary for the juror to interpret* * * * The task of the juror therefore * * * is to interpret this language without words, as well as he can, and distinguish the true from the false · * * * An important phase of the study of this wordless language is no doubt a scrutiny of everything about a speaker that may indicate sincerity or insincerity. The steps down seem to be unnaturalness, uneasiness, nervousness, hesitation, affectation, concealment and deceit, and the steps up seem to be outspokenness, naturalness, frankness, openness, and properly qualified statements." Osborn, The Mind of the Juror (1937) 86–98.

27 As, for instance, asking questions which, although objected to and not answered, improperly introduce into the record suggestions calculated unfairly to prejudice the jury.

28 See also, e.g., Hall v. United States, 4 Cir., 256 F. 748, 752; August v. United States, 8 Cir., 257 F. 388, 393; United States v. Perlstein, 3 Cir., 120 F.2d 276, 283, 284; Pierce v. United States, 6 Cir., 86 F.2d 949, 953; Ippolito v. United States, 6 Cir., 108 F.2d 668, 671. As to the same rule in civil litigation, see, e.g., New York Central R. Co. v. Johnson, 279 U.S. 310, 318, 49 S.Ct. 300, 73 L.Ed. 706.

The rule in Berger's case is but a special application of the harmless error doctrine announced in Bollenbach's case. There is nothing novel in such an application.

In People v. Fielding, 158 N.Y. 542, 553, 554, 53 N.E. 497, 500, 46 L.R.A. 641, 70 Am.St.Rep. 495, where an inflammatory argument led to reversal, the Court said, "Whether the defendant be innocent or guilty, in our opinion he has not been adjudged guilty in accordance with law, because he has not had the fair and impartial trial which the law prescribes for a person charged with crime. If we disregard a sound and well-established rule in his case because we think he is guilty, we tear down one of the safeguards provided by society for the protection of its citizens, and the precedent may at some time aid in depriving an innocent man of his liberty or life."

29 Indeed it has been said that such re-

such as Morgan, tell us that today, unfortunately, a jury trial usually is "a game in which the contestants are not the litigants but the lawyers."[30] An experienced trial lawyer writes: "It is a well recognized fact that in most cases the jury 'tries' the lawyers rather than the clients * * * The personality of the lawyer is constantly before the jury and he gradually absorbs the client's cause to such an extent that unconsciously in the minds of the jury it becomes the lawyer's cause." [31] And the courts have said that the words of the government's lawyer are likely to be exceptionally impressive, since he is an official.[32]

Exception (as usual) is made when the evidence against the defendant is "strong," i.e., the evidence of guilt is "overwhelming," so that it is all but impossible to believe that any sensible jury would have acquitted even if no improper remarks had been made; in such a case, no court will reverse, no matter how seriously the government counsel misbehaved.

United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, is a typical exceptional case. There the Court (310 U.S. at page 177, 60 S.Ct. 811, 824, 84 L.Ed. 1129) pointed out that evidence sustaining the verdict consisted *"almost entirely"* of *"unequivocal testimony or undisputed contents of exhibits, only occasionally on the irresistible · inferences [drawn] from those facts"*; accordingly the Court—citing with approval but distinguishing Berger v. United States supra,—said (310 U.S. at page 239, 60 S.Ct. at page 852, 84 L.Ed. 1129) that "this was not a weak case," and that therefore

the improper remarks of government counsel did not constitute prejudicial error requiring reversal.[33] Also illustrative of the kind of case in which misconduct of the United States Attorney will properly not induce reversal is Robbins v. United States, 9 Cir., 229 F. 987, 988, where the Court said the verdict "rested upon evidence so clear and convincing that the jury could not have determined otherwise than as they did," and the jury was therefore "compelled to reach" that verdict, despite the misconduct. That, and Horning v. District of California, 254 U.S. 135, 41 S.Ct. 53, 65 L.Ed. 185, and Socony-Vacuum, supra, show what is meant by a "strong" case.[33a]

Very different is a case where the testimony is sharply in conflict, so that the credibility of the witnesses is crucial, and the jury could reasonably have found the defendant either innocent or guilty. In those circumstances, although, absent error, the verdict will not be set aside as unsupported by the evidence, nevertheless such a case is not "strong" and therefore a conviction will be reversed because of egregious misconduct by government counsel. And surely, the evidence of guilt is not "overwhelming" where, as here, not only is the testimony in sharp conflict, but the government's case depends in considerable part on testimony of accomplices (see Berger's case, 295 U.S. at page 89, 55 S.Ct. 629, 79 L.Ed. 1314) [33b] and there is undisputed evidence of witness intimidation (as shown in the Appendix hereto).

There is no room for the suggestion that Socony-Vacuum overruled Berger's case; for the latter was cited with approval, since

marks "unavoidably operate as evidence"; Latham v. United States, 5 Cir., 226 Fed. 420, 425, L.R.A.1916D, 1118.

[30] Morgan, Book Review, 49 Harv.L. Rev. (1936) 1387; cf. Osborn, The Mind of the Juror (1937).

[31] Goldstein, Trial Technique (1935) 219–220.

[32] "The prosecuting officer is usually a person of considerable influence in the community, and the fact that he represents the government of the United States lends weight and importance to his utterances. He does not occupy the position of a defendant's counsel, but appears before the jury clothed in official raiment, discharg-

ing an official duty"; Latham v. United States, 5 Cir., 226 F. 420, 422, 425. See also Cassemus v. State, 16 Ala.App. 61, 75 So. 267, 268.

[33] Emphasis added.

The Court also said (310 U.S. at page 238, 60 S.Ct. at page 852, 84 L.Ed. 1129) that much of counsel's argument to the jury was "relevant to the issues" and (310 U.S. at pages 241, 242, 60 S.Ct. at page 853, 84 L.Ed. 1129) was responsive to "impressions sought to be conveyed" by the defense.

[33a] See also cases cited in notes 12 and 12a.

[33b] See note 9a, supra.

Socony-Vacuum, in Viereck v. United States, 318 U.S. at page 248, 63 S.Ct. 561, 87 L.Ed. 734. Moreover, the Court still applies its usual "strong case" test when it is claimed that an error did no harm; so in Glasser v. United States, 315 U.S. 60, 67, 62 S.Ct. 457, 463, 86 L.Ed. 680, decided after Socony-Vacuum, the Court, in reversing a conviction, characterized the government's case as not "strong," adding, "Then error, which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial since there is a real chance that it might have provided the slight impetus which swung the scales toward guilt."

5. True, it is generally held that error consisting of misconduct of counsel will be deemed to have been cured if the trial court promptly gave the offending counsel a "stern rebuke,"[34] and immediately cautioned the jury to disregard the misconduct. But when (a) counsel's remarks are of an unusually inflammatory character (or he has otherwise flagrantly misbehaved) and (b) the evidence of guilt is not "overwhelming," then almost everywhere in criminal cases (except in this circuit) and virtually everywhere in civil cases, it has been held that neither a cautionary instruction nor any other action by the trial judge, by way of rebuke or otherwise, suffices to purge the error, but that he should grant a mistrial or a new trial, and that, if he does not do so, the judgment must be reversed.

See, e. g., Pharr v. United States, 6 Cir., 48 F.2d 767, 770, 771; Towbin v. United States, 10 Cir., 93 F.2d 861, 868; Volkmor v. United States, 6 Cir., 13 F.2d 594, 595; Skuy v. United States, 8 Cir., 261 F. 317, 319, 320; Robinson v. United States, 8 Cir., 32 F.2d 505, 508, 66 A.L.R. 468; Maytag v. Cummins, 8 Cir., 260 F. 74, 82, 16 A.L.R. 712; Latham v. United States, 5 Cir., 226 F. 420, 425; Frisby v. United States, 35 App.D.C. 513, 520; Vaughan v. Magee, 3 Cir., 218 F. 630, 631, 632; James Stewart & Co. v. Newby, 4 Cir., 266 F. 287, 295, 296; Beck v. Wings Field, Inc., 3 Cir., 122 F.2d 114, 117; Pierce v. United States, 6 Cir., 86 F.2d 949, 952, 953; People v. Levan, 295 N.Y. 26, 36, 64 N.E.2d 341; People v. Fielding, 158 N.Y. 542, 53 N.E. 497, 46 L.R.A. 641, 70 Am.St.Rep. 495; People v. White, 365 Ill. 499, 6 N.E.2d 1015, 1012; Lickliter v. Commonwealth, 249 Ky. 95, 60 S.W.2d 355, 357; Cassemus v. State, 16 Ala.App. 61, 75 So. 267, 268; cf. Waldron v. Waldron, 156 U.S. 361, 383, 384, 15 S.Ct. 383, 39 L.Ed. 453; Throckmorton v. Holt, 180 U.S. 552, 567, 21 S.Ct. 474, 45 L.Ed. 663; Lockhart v. United States, 9 Cir., 35 F.2d 905, 907; Middleton v. United States, 8 Cir., 49 F.2d 538, 540.

This rule was well stated a few months ago (November 29, 1945) in People v. Levan, 295 N.Y. 26, 34-36, 64 N.E.2d 341, 345, where the court reversed a conviction for murder; there the district attorney told the jury: "Now, this defendant appears here in this court room in an Army uniform. I don't suppose the fact that he wears this uniform means a thing, as far as any effect on your judgment, gentlemen. * * * There are many men wearing this uniform and doing their duty in other parts of the world beside Harlem and New York City." These remarks were not appreciably longer than those of government counsel in the case at bar. But the highest court of New York (citing Viereck's and Berger's cases, supra) ruled as follows: "It should be said that in the case now before us the jury was told by the court '* * * you are not going to convict this defendant because there are other men on the other side being shot, or serving their country. You are not to convict him on that theory at all.' We cannot say, however, with assurance that the jury did disregard the clear implications from the emphasis placed by the prosecuting attorney upon the damning fact that the defendant had absented himself without leave from his military duties in a time of war. The virus thus implanted in the minds of the jury is not so easily extracted."[35] In Berger v. United States, supra, the Court

[34] Berger v. United States, supra.

[35] In Latham v. United States, 5 Cir., 226 F. 420, 425, the Court said: "Every one must realize that there are exceptional cases where, although the court does stop counsel, and does caution the jury, the impression has been made by the remarks of counsel, and although the jury honestly try to ignore that impression, it still enters into and forms

concluded by citing as "especially apposite," People v. Wells, 100 Cal. 459, 34 P. 1078, 1079, 1080.[36] In the Wells case the court quoted with approval from People v. Ah Len, 92 Cal. 282, 28 P. 286, 27 Am.St.Rep. 103, where a conviction was reversed for grave improprieties by government counsel although "the trial court warned the jury specially on the subject."

Indeed, the judge's cautionary instruction may do more harm than good: It may emphasize the jury's awareness of the censured remark[37]—as in the story, by Mark Twain, of the boy told to stand in the corner and not think of a white elephant.

6. Particularly with respect to improper remarks of counsel, my colleagues in criminal cases do not follow the usual rule. They argue in effect, that, as the matter is inherently guessy, it is impossible ever to be sure that improper remarks of counsel influenced the verdict; for that reason, this court does not, in criminal cases, reverse for such an error. The rule in this court appears, I think, from the following: Beginning with 1934, and prior to the instant case, the question has arisen five times in this circuit.[38] In United States v. Berger, 1934, 2 Cir., 73 F.2d 278, 281, this court said that the United States Attorney had seriously misbehaved but that "it would be

extravagant now to reverse the conviction on" that account, "for it is fantastic to suppose that it substantially determined the outcome," adding that "to-day, when mere possibilities do not interest us as they did our forerunners, we demand more tangible evidence that damage has been done." [39] The Supreme Court reversed that decision, because (as previously noted) it said the case was "weak." Berger v. United States, 1935, 295 U.S. 78, 85–89, 55 S.Ct. 629, 79 L. Ed. 1314. Thereafter, in four cases, this court, while citing the Supreme Court's decision in Berger's case, affirmed convictions, notwithstanding what it conceded to be grave misconduct by government counsel. See United States v. Dubrin, 1937, 2 Cir., 93 F.2d 499, 506; United States v. Lotsch, 1939, 2 Cir., 102 F.2d 35, 37; United States v. Weiss, 1939, 2 Cir., 103 F.2d 348, 355;[40] United States v. Buckner, 1940, 2 Cir., 108 F.2d 921, 928, 929. In other words, since the time it was reversed in Berger's case, this court, in every instance where a United States Attorney has seriously misbehaved, has found that the case against the defendant was so "strong" that the Berger doctrine was inapplicable. It might be thought that, in each of these instances, there was, in fact, "overwhelming" evidence of guilt. But I believe there is a different explanation of at least some of those decisions: My col-

---

a part of the verdict. In such cases the trial court should set aside the verdict on motion for a new trial. The language of Justice Fowler, in Tucker v. Henniker, 41 N.H. [317], 325, is pertinent, and applies with great force to criminal prosecutions: 'Yet the necessary effect is to bring the statement of counsel to bear upon the verdict with more or less force, according to circumstances; and if they in the slightest degree influenced the finding, the law is violated, and the purity and impartiality of the trial tarnished and weakened. * * * It is unreasonable to believe the jury will utterly disregard them. They may struggle to disregard them. They may think they have done so, and still be led involuntarily to shape their verdict under their influence. * * * To an extent not definable, yet to a dangerous extent, they [these remarks] unavoidably operate as evidence which must more or less influence the minds of the jury * * *.' "

[36] There the Court said: "It is too much the habit of prosecuting officers to

assume beforehand that a defendant is guilty, and then expect to have the established rules of evidence twisted, and all the features of a fair trial distorted, in order to secure a conviction. If a defendant cannot be fairly convicted, he should not be convicted at all; and to hold otherwise would be to provide ways and means for the conviction of the innocent."

[37] See State v. Accardo, 129 La. 666, 56 So. 631, 632.

[38] I put to one side United States v. Mortimer, 2 Cir., 118 F.2d 266, 268, where this court found the remarks of counsel not objectionable.

[39] After this court was reversed in Berger's case, it repeated the same notion in United States v. Liss, 2 Cir., 137 F.2d 995, 999, in language I quoted above, viz., that there is a "modern disposition to assume that an error has been harmless * * *."

[40] Reversed on other grounds, 308 U. S. 321, 60 S.Ct. 269, 84 L.Ed. 298.

leagues simply do not accept the usual definition of a "strong" case.[41]

I think this appears from United States v. Mitchell, discussed above. In like manner, in United States v. Buckner, 2 Cir., 108 F.2d 921, this court refused to reverse for counsel's shocking improprieties because it held (page 928) the "proof is strong and convincing", although it said (page 926) as to some of the defendants that unlawful intent "could clearly have been inferred"— not at all that no other reasonable inference could have been drawn; and it said (page 930) as to one of the defendants, that "the jury was amply justified in so concluding * * * that [he] knew of and assisted in the conspiracy"—not at all that no other reasonable conclusion was possible. See how different were these facts from those in Socony-Vacuum; and compare the reasoning of this court in the Buckner case with that in Volkmor v. United States, 6 Cir., 13 F.2d 594, 595, where the circuit court reversed because of remarks of government counsel (which, under the admonition of the trial court, he withdrew) although the circuit court held the evidence sufficient to sustain the verdict, saying, "From these facts, with such explanation as defendant offered, the jury might or might not have inferred a fraudulent intent." Patently, in Buckner's case, as in United States v. Mitchell, supra, my colleagues' affirmance rested on their own belief in defendants' guilt, despite the conflicting testimony. And so, as I have already shown, in the instant case.

My colleagues mistakenly state, as to the "men overseas" remarks of government counsel, that the trial court "promised to take care of the matter in its charge," and that this course was "apparently completely acceptable to the defendants." As will be seen from the colloquy quoted in the note,[42] the trial judge made no such promise, and defendants did not therefore indicate that such a course would be acceptable. True, having promptly and forcefully objected to the "men overseas" argument of counsel, defendants' lawyers did not go further and ask for a mistrial or object to the judge's charge in that respect after it was given. But it is revelatory that their failure to do so has been treated by my colleagues as a waiver of defendants' right to assign error now. For, even if defendants had not so much as mentioned the matter in the trial court, my colleagues would not hesitate to note it on appeal, if they regarded the error as grave enough to be a ground of reversal.[43] In Pierce v. United States, 6 Cir., 86 F.2d 949, 953, 954, the court rejected the contention "that the improper conduct of the prosecuting attorneys was waived by failure of the defendants to move for a mistrial." Judge Simons said: "Above and beyond all technical procedural rules, designed to preserve the rights of litigants, is the [public's] maintenance of the nation's courts as fair and impartial forums where neither bias nor prejudice rules, and appeals to passion find no place, though the government itself be there a litigant. * * * Where such paramount considerations are involved, procedural niceties will not preclude a court from correcting error." See New York C. R. Co. v. Johnson, 279 U.S. 310, 318, 49 S.Ct. 300, 73 L.Ed. 706.[44] We have so held as to other kinds of error; see e. g., United States v. Trypuc, 2 Cir.,

---

[41] That is, one in which the inference of guilt is "irresistible" (United States v. Socony-Vacuum Oil Co., supra), because the evidence against defendant is "overwhelming" (Berger's case), is "so clear and convincing that the jury," if reasonably sensible, "could not have determined otherwise than [it] did" had no error been committed. Robbins v. United States, supra. See note 12, supra.

[42] See note 4a, supra.

[43] See, e. g., Wiborg v. United States, 136 U.S. 632, 658, 16 S.Ct. 1127, 1197, 41 L.Ed. 289; United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L. Ed. 555; Brasfield v. United States, 272

U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345; New York C. R. Co. v. Johnson, 279 U.S. 310, 318, 49 S.Ct. 300, 73 L. Ed. 706; Crawford v. United States, 212 U.S. 183, 194, 29 S.Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392; Van Gorder v. United States, 8 Cir., 21 F.2d 939, 942; Meadows v. United States, 65 App.D.C. 275, 82 F.2d 881, 884; Miller v. United States, 10 Cir., 120 F.2d 968, 970.

[44] For similar rulings with respect to improper remarks of counsel, see Towbin v. United States, 10 Cir., 93 F.2d 861, 868; cf. Skuy v. United States, 8 Cir., 261 F. 316, 321.

136 F.2d 900, 902; United States v. Haug, 2 Cir., 150 F.2d 911; and our Rule 10. That my colleagues refuse so to hold here is a fairly obvious sign that they hold that improper remarks of government counsel are not sufficient to compel reversal when my colleagues believe a defendant guilty.

Notwithstanding, as previously noted, that two of the government's important witnesses were self-confessed accomplices [44a] and that there was uncontradicted testimony of witness intimidation by the government, my colleagues argue that the case here is "strong". Their argument, spelled out, runs thus: (1) As the verdict was against the defendants, it must be assumed (according to my colleagues) that, although the testimony was in conflict, the jury disbelieved the defendants' witnesses (including their testimony about intimidation), believed the government's witnesses, and, accordingly, drew inferences from the defects in the products to the effect that they showed fraud on the part of the defendants; (2) therefore (so my colleagues seem to imply) we must similarly disbelieve the defendants' witnesses, believe the government's, and draw the same inferences; (3) from this it follows (my colleagues reason) that the case was "strong"; (4) consequently (say my colleagues), we must conclude that the case, not being "weak," the improper remarks of government counsel did not influence the jury. Plainly, such an argument proves too much; it wholly destroys the ruling in Berger's case and similar cases: Since the question of the effect on the jury of government counsel's remarks can never arise unless there is a verdict of guilt, the result must be that, if my colleagues are correct (i. e., that a verdict of guilty is invariably to be taken as demonstrating that the evidence of guilt was so overwhelming that the misconduct did not influence the jury), in no case can such conduct be reversible error—for then every case in which a defendant appeals is a "strong" case.

Surely, correct reasoning runs the other way: As the evidence of witness intimidation and the use of accomplices' testimony disclose a recognition by the government of the "weakness" of the government's case, it should be assumed that the case is not "strong" and that the verdict against the defendants resulted from the misconduct (i. e., that the evidence is not such that, absent the misconduct, a reasonable jury would indubitably have found defendant guilty.)

I think it plain, then, that, because of their unique conception of "harmless error" and their interpretation of a "strong case", my colleagues do not follow the rule in Berger's case, but, remaining renitent, render it mere lip service: Just as they refuse to reverse for erroneously admitted evidence when, despite conflicting testimony, they believe a defendant guilty,[45] so they do likewise as to counsel's improper remarks in a criminal suit.

Strangely enough, my colleagues have taken a different position as to misconduct of counsel in civil litigation. In Brown v. Walter, 2 Cir., 62 F.2d 798, 799, 800, the lawyer for the successful plaintiff, in an automobile collision case, injected into the record the fact that the nominal defendant was insured by an insurance company. Although the trial judge cautioned the jury not to heed that fact this court reversed, citing cases—including James Stewart & Co. v. Newby, 4 Cir., 266 F. 287, 295, 296, and Brooke v. Croson, 61 App.D.C. 159, 58 F.2d 885—to effect that "no caution would serve to cure" such an error.[46] Surely, if that rule is to be invoked to protect the pocketbook of an insurance company,[47] it should be invoked in the instant case to protect natural persons from being sent to jail unjustly.

A jury trial, at best, is chancy.[48] "Mr. Prejudice and Miss Sympathy are the names of witnesses whose testimony is

---

44a The trial judge, in his charge, said of them: "By their own testimony, they were accomplices * * *"

45 With the exceptions noted in the Appendix hereto.

46 See 36 C.J. 1128–1129; 56 A.L.R. 1525, 1526.

47 The judgment reversed in Brown v. Walter was for some $11,000.

48 In United States v. Rubenstein, supra, I said: "A jury trial unquestionably has defects. At best, such a trial, especially as now conducted—i. e., as if it were a game or sporting event—is an

not recorded, but must nevertheless be reckoned with * * *";[49] and most jurors have no trained capacity for doing so. A keen observer has said that "next to perjury, prejudice is the main cause of miscarriages of justice."[50] If government counsel in a criminal suit is allowed to inflame the jurors by irrelevantly arousing their deepest prejudices, the jury may become in his hands a lethal weapon directed against defendants who may be innocent.[51] He should not be permitted to summon that thirteenth juror, prejudice.[52] Law suits, do what we will, are hazardous: A missing witness, a lost document—these and numerous other fortuitous factors may result in a man's losing his life, liberty or property unjustly. When the government puts a citizen to the hazards of a criminal jury trial, a government attorney should not be allowed to increase those hazards unfairly.[53] When, as here, such an at-

---

imperfect, all-too-human, instrument for ascertaining the true facts of a case. As Borchard reported several years ago and as current discussion in the press of the recent Campbell case dramatically reminds us, occasionally it is discovered that an innocent man, after a jury trial, has been convicted and sent to jail or put to death by the government. No one can doubt that there have been undiscovered instances (no one knows how many) of convictions of the innocent. Unfortunately, some tragedies of that kind are bound to occur. I, for one, do not care to accept responsibility for any such miscarriage of justice which, with reasonable precautions, could have been avoided."

[49] Osborn, The Problem of Proof (2d ed. 1926) 112.

[50] Osborn, The Mind of the Juror (1937) 87.

[51] In People v. Malkin, 250 N.Y. 185, 201, 164 N.E. 900, 907, Judge Lehman said: "Society may be endangered as much by the violence of its friends as of its enemies, and an appeal to prejudice as a factor in determination of guilt is, in the final analysis, an appeal to violence. The majesty of the law must remain unchallenged. It is threatened by each trial where there is a justified doubt of fairness and impartiality."

[52] Osborn, The Mind of the Juror (1937) 92.

[53] Because these hazards are great, many reflective persons have entertained disturbing doubts about the wisdom of the jury system. Typical are these observations:

"When a group of twelve men, on seats a little higher than the spectators but not quite so high as the judge, are casually observed it may appear from their attitude that they are thinking only about the case going on before them. The truth is that for much of the time there are twelve wandering minds in that silent group, bodily present but mentally far away. Some of them are thinking of sadly neglected business affairs, others of happy or unhappy family matters, and, after the second or third day and especially after the second or third week, there is the garden, the house-painting, the new automobile. the prospective vacation, the vexatious notes coming due on the first of the month, the boy in college, the girl who is soon to be married and the hundred and one other things that come to the mind of one who is only partly interested in a tedious proceeding going on before him. There is probably more wool gathering in jury boxes than in any other place on earth * * * Someone has said that the invention of this jury system is one of the 'splendid achievements of civilization,' but its splendor is now and then somewhat dimmed when some juryman frankly tells just what occurred in some jury-room. Too often it then clearly appears that in reaching the verdict reported they were not exactly inspired from on high * * * If for a term of court or two a complete transcript of all the comments, criticisms, and reasons of jurors in jury-rooms could be made and furnished to trial counsel. the judge, the officers of the bar association, the judiciary committee in the state legislature. the jury commissioners, and the newspapers, it would no doubt furnish some suggestions looking toward improvement. If this exposure did not bring about the total abolition of the jury system it would perhaps tend to bring about improvement in some of the methods of selecting jurors, or perhaps a selection of the kind of cases to be submitted to juries * * * It is plainly said by those whose opinions command the utmost respect that the administration of the law in this land is on a lower plane than other phases of government and is unworthy of the civilization it poorly serves." Osborn, The Mind of the Juror (1937) 118, 163–164, 167.

Said Carl Becker, in Freedom and Responsibility (1945) 81–82: "Today the prime qualification for service on a jury is complete ignorance of the circumstances of the crime and of the persons involved in it. Jury trial in criminal cases

torney has done so, I, as a government servant, am· unwilling to ·approve the result. I think it is our duty to give these defendants another trial.

7. The majority opinion here contains an implication that only a super-sentimental or excessively soft-minded judge, inadequately aware of the need to safeguard the public from criminals, would favor reversal of a conviction because of the sort of error present here. Perhaps I am such a mushy-souled sentimentalist.[54] But no such charge can be leveled at the many judges who, in reversing convictions, have employed the rule I think applicable here. (Perhaps they share with G. K. Chesterton a disdain for "that miserable fear of being sentimental, which is the meanest of all the modern terrors.") I refer to Chief Justice Stone,[55] Mr. Justice Sutherland,[56] and to circuit judges such as, e.g., Simons,[57] McDermott,[58] and Sanborn. In Miller v. Territory of Oklahoma, 8 Cir., 149 F. 330, 339, 9 Ann.Cas. 389, Judge Philips said: "The foregoing incident strikingly illustrates where the responsibility for the miscarriage of justice in criminal prosecutions should sometimes be placed, instead of imputing the reversal of convictions by the appellate courts to what is popularly termed mere technicalities.' The zeal, unrestrained by legal barriers, of some prosecuting attorneys, tempts them to an insistence upon the admission of incompetent evidence, or getting before the jury some extraneous fact supposed to be helpful in securing a verdict of guilty, where they have prestige enough to induce the trial court to give them latitude. When the error is exposed on appeal, it is met by the stereotyped argument that it is not apparent it in any wise influenced

has become a carefully staged combat between two sets of skilled attorneys, each set primarily concerned, not with establishing the truth about the crime, but with limiting and distorting the evidence in the way best calculated, on the one side to convince the jury that the defendant is guilty, on the other to convince the jury that he is innocent. The function of the judge is to see that the rules of law are observed. The function of the jury is supposed to be to determine the facts. But it is obvious that the ordinary jury is quite incapable of determining the relevant facts elicited in a long and complicated trial, even if they had the full record before them and sufficient time to examine it thoroughly * * * Not that any particular blame attaches to attorneys. No more than other people do they really wish to convict an innocent or discharge a guilty defendant. They are prisoners of the system. Better than anyone they know that juries are incapable of performing the function assigned to them * * * We are so familiar with trial by jury in criminal cases that it is difficult to look at it objectively. Besides, we have been taught to believe that the administration of justice in English and American courts is the best that has been developed in any society. Taken by and large, that is true; but it still remains true that trial by jury, as a method of determining facts, is antiquated, unscientific, and inherently absurd—so much so that no lawyer, judge, scholar, prescription clerk, cook, or mechanic in a garage would ever think for a moment of employing that method for determining the facts in any situation that concerned him. I am far from suggesting that the judicial process, or any part of it, should be lightly abandoned, or even reformed without the most careful consideration. But certainly in this age, when fact-finding has become very nearly an exact science, some better method could be devised for determining the guilt or innocence of a person accused of crime than one that excludes much relevant evidence, makes far too much of whatever distinction there may be between 'direct' and 'circumstantial' evidence, and turns the investigation over to two sets of rival attorneys whose professional success depends, not on finding out what happened, but on winning the case." See also Dean Green, Trial by Jury (1930) Chap. 15.

*A judge may share such doubts and yet feel obligated to see that judges do not, by indirection, invade the jury's province.* See Appendix hereto.

[54] Having done my stint as a government enforcing official for some eight years, I doubt it.

[55] See Viereck v. United States, 318 U.S. 236, 247, 248, 63 S.Ct. 561, 87 L. Ed. 734.

[56] See Berger v. United States, 295 U.S. 78, 85–89, 55 S.Ct. 629, 79 L.Ed. 1314.

[57] See Pierce v. United States, 6 Cir., 86 F.2d 949, 953.

[58] See Beck v. United States, 8 Cir., 33 F.2d 107, 114; Coulston v. United States, 10 Cir., 51 F.2d 178, 182, 183.

the minds of the jury. The reply the law makes to such suggestion is: that, after injecting it into the case to influence the jury, the prosecutor ought not to be heard to say, after he has secured a conviction, it was harmless. As the appellate court has not insight into the deliberations of the jury room, the presumption is to be indulged, in favor of the liberty of the citizen, that whatever the prosecutor, against the protest of the defendant, has laid before the jury, helped to make up the weight of the prosecution which resulted in the verdict of guilty." And see Judge Sanborn's opinion in Skuy v. United States, 8 Cir., 261 F. 316, 319, 320, where the court reversed for improper remarks of counsel, despite the trial judge's cautionary instruction. The English cases, discussed above, are also pertinent here; for English judges are not proverbially chicken-hearted, nor has administration of criminal justice in England been notoriously lax.

8. Judges who accept what I consider the correct view of harmless error do not demand perfection in trials, or engage in fly-specking scrutiny of trial records.[59] Also, in condemning appeals to prejudice, they have in mind the different meanings of the word "prejudice": Every society has its fundamental "value judgments," which constitute its established predilections, ideals, preconceptions—"prejudices" in that sense of the word.[60] To the extent, then, that a government lawyer appeals to those cherished values, so far as they are relevant to the case in hand, he acts appropriately. So, too, when he urges the jury to discern the hidden motives of the defendant's witnesses. "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence."[61] But a government lawyer acts unfairly when he arouses jury prejudices that are irrelevant and distracting.[62]

9. This court has several times used vigorous language in denouncing government counsel for such conduct as that of the United States Attorney here. But, each time, it has said that, nevertheless, it would not reverse. Such an attitude of helpless piety is, I think, undesirable. It means actual condonation of counsel's alleged offense, coupled with verbal disapprobation.[63] If we continue to do nothing practical to prevent such conduct, we should cease to disapprove it. For otherwise it will be as if we declared in effect, "Government attorneys, without fear of reversal, may say just about what they please in addressing juries, for our rules on the subject are pretend-rules. If prosecutors win verdicts as a result of 'disapproved' remarks, we will not deprive them of their victories; we will merely go through the form of expressing displeasure. The deprecatory words we use in our opinions on such occasions are purely ceremonial." Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of this court—recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary.

On the other hand, a reversal in a case like this might well serve as a deterrent: If it became known that misconduct of a

---

[59] See comment of L. Hand, J., in which I concurred, in United States v. Warren, 2 Cir., 120 F.2d 211, 212, and my dissenting opinion in United States v. Liss, 2 Cir., 137 F.2d 995, at page 1004.

[60] For a fuller discussion, see In re J. P. Linahan, 2 Cir., 138 F.2d 650, 651, 652.

[61] Id. 138 F.2d at pages 653, 654.

[62] Id. 138 F.2d at page 652.

[63] Thus, in United States v. Buckner, 2 Cir., 108 F.2d 921, 928 this court said: "Even from the printed record we can see the vigor with which the prosecutor pressed the case, vigor which at times went beyond the canons of decorum and dignity which an officer of the United States should observe. The prosecutor was not averse to indulging his talent for spectacle. * * * Nor was the intemperance of several attacks made upon defendants and their counsel in keeping with the Supreme Court's reminder that the prosecutor is to regard himself as 'the servant of the law.' Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. We cannot approve such conduct."

But the conviction was affirmed; see discussion of the Buckner case, supra.

United States Attorney had caused the public the expense of a new trial, his resultant unpopularity might tend to make him subsequently live up to professional standards of courtroom decency.[64] If this court really meant business about such behavior as that of government counsel in the case at bar, if it actually considered such behavior reprehensible, it would, at a minimum, announce that if, in any future case any government lawyer should thus conduct himself, it would deprive him of the right to practice in this court and would recommend that he be removed from his office as a representative of our government.

This is no light matter. In its Report on Lawlessness in Law Enforcement,[65] the National Committee on Law Observance and Enforcement said, in 1931, of unfairness in prosecutions (including "the various forms of misconduct by prosecutors * * * in the courtroom," such as unfair and inflammatory comments and appeals to prejudice): "First, these unfair practices are a type of lawless enforcement of law which is especially liable to create resentment against law and government, because they are committed by district attorneys * * *—the very officials most definitely responsible for law observance. Moreover, these abuses usually occur in the publicity of a courtroom. They are not hidden away and subject to denial like the third degree. They are witnessed by spectators and may be recorded by the press, so that many members of the public may be revolted by the oppressive conduct of men chiefly responsible for the administration of justice. Such resentment easily engenders the dangerous feeling that a fair trial has been denied because the defendant belongs to an unpopular group and that for members of such a group justice through the courts is not to be expected * * * [65a] Not to be overlooked is the effect of unfairness upon the accused. Even if he is guilty there are degrees of criminality which he may not yet have reached. It may still be possible to accomplish his readjustment to society, but hardly so if he feels deeply and justly that society in the person of its chief representatives has behaved tyrannically and brutally. The natural effect of this motion is to alienate him still further from the community and make him regard his criminal associates as the only men who treat him decently. In consequence he may leave prison a bitter enemy of society, more willing than before to continue a criminal career. His resentment will be shared by his family and friends. The result of the unfairness upon these persons and upon the public will be a decrease in respect for law, which is a main factor in assuring its observance * * * Thirdly, and perhaps most seriously, unfair practices may result in the conviction of the innocent."

A legal system is not what it says, but what it does. Our "criminal law," then, cannot be described accurately in terms merely of substantive prohibitions; the description must also include the methods by which those prohibitions operate in practice —must include, therefore, not the substantive and procedural rules as they appear in words but as they actually work, or, as Llewellyn puts it, "the net operation of the whole official set-up, taken as a whole," for it "is that net operation—it is the substantive rule only as it trickles through the screen of action—which counts in life."[66] With opinions like that in the instant case —in which my colleagues go so far as to express a fear that reversal for a new trial would be "deadening to the morale" of the prosecutor—the "official set-up," as

---

[64] In dissenting in Rubenstein v. United States, 2 Cir., 151 F.2d 915, 919, 924, I said: "It will not do to say that, were my thesis accepted, delay and expense would ensue. They are of far less importance than a fair trial. And they will be incurred infrequently because of errors if, by reversals in cases like this, we educate prosecutors and trial judges to prevent unfairness to a person on trial."

[65] By Chafee, Pollak and Stern.

[65a] See Cahn, Justice, Power and Law, 55 Yale L.J. 336 (1946) as to the "sense of injustice." He quotes Aristotle, Nicomachean Ethics, Bk. V, Ch. 6, to the effect that "law exists for men between whom there is injustice."

[66] Introduction to Hall, Theft, Law and Society; cf. Cahn, loc. cit. 347.

sanctioned by this court, will surely include a disregard by government lawyers of precepts against rabble-rousing jury speeches.

I have spelled out this dissent at what may appear to be unseemly length because it deals with a subject I consider of the gravest importance for this reason: Order is a necessary condition of social existence; to attain that order, a society makes laws, the infraction of which it punishes; one of the functions of courts is to direct such punishment. But our kind of society deems it an essential principle that no court shall direct that any man be punished except after a fair trial. As no one can prove that a society rejecting that principle cannot attain order, some skeptics sneer at that principle, call it super-refined nonsense. It is, however, part of the American faith that, without that principle, a society would be inadequately civilized. That faith our courts, I think, should vindicate by a jealous insistence that trials should not only appear to be but should actually be fair. In the vale of human perplexities, perfection in that endeavor is impossible. But recognition of that impossibility should not deter us from approaching as near the ideal of such fairness as we can. And I think this court needlessly falls far short of it, if it affirms a conviction of defendants, obtained in marked violation of the rules governing fair trials, merely because the judges of this court believe those defendants guilty. If it does so, it is, I think, helping to undermine a basic tenet of the American faith. That seems to me to be dangerous in these days when America is seeking to induce the world to accept its conception of civilization as a pattern of world order. Perhaps my sense of humor has indeed deserted me, and I indulge in exaggeration; but I think not: The courts alone can neither create moral principles nor tear them down, but they can be among the vital agencies which either preserve or corrode them.

Lawyers may talk rhapsodically of JUSTICE. They may, in Bar Association meetings, hymn the pre-eminent virtues of "our Lady of the Common Law," prostrate themselves devotedly before the miracle of the common law's protection of human liberties. But, in the last analysis, there is only one practical way to test puddings: If, again and again in concrete instances, courts unnecessarily take the chance of having innocent men sent to jail or put to death by the government because they have been found guilty by juries persuaded by unfair appeals to improper prejudices, then the praises of our legal system will be but beautiful verbal garlands concealing ugly practices we have not the courage, or have grown too callous, to contemplate.

Some judges disavow responsibility for such ugliness, asserting that the judiciary has no concern with whether or not the existing legal machinery yields injustice. They agree with Lord Sumner that judges "are not now free in the twentieth century to administer the vague jurisprudence which is sometimes attractively styled 'justice as between man and man.'"[67] Happily, that sort of "dispassionateness" does not represent the current judicial ideal. Most judges today acknowledge that administering justice constitutes at least part of their official obligations.[67a] That acknowledgment, however, remains worse than empty unless it translates itself into action.

Of course, no human contrivances for getting at the fact of guilt or innocence can be infallible. Even if the greatest care be used, some guiltless men are bound to be punished. That risk seems to many reflective thinkers greater than it should be, because we ask casually selected groups of twelve persons, most of them untrained in the difficult art of fact-finding, to make the decisions. But, since our society continues to prize the jury as a fact-finding instrument, we are committed to taking that extra risk.[68] For that very reason, I sub-

---

[67] Baylis v. Bishop of London, 1913, 1 Ch. 127, 140.

[67a] Cf. Cahn, loc. cit., 355, 359.

[68] Self-scrutiny helps to explain to me why some judges highly praise the jury, especially in criminal cases: For a conscientious judge, as the official deputy of

organized society, to find the facts which will decide whether a fellow man is to be imprisoned or executed would be no trifling matter. An awful responsibility would rest upon the judge if he, rather than a jury, were called upon the choose between the witnesses, to conclude which

mit, judges should be extraordinarily vigilant to prevent the unfortunate consequences of carelessly utilizing that risky instrument.

Something like our modern jury was employed by the ancient Greeks. One of the wisest of those Greeks gave his fellows some advice we would do well to follow: "It is not right to pervert the jurymen by moving them to anger or envy or pity—one might as well warp a carpenter's rule before using it."[69]

### Appendix

I. *Evidence Showing that the Government's case was not "strong."*

1. The following evidence goes to show that the defective work may well have been due, not to fraud, but to the inexperience and incompetence of Antonelli, the other defendants and the employees.

Antonelli, the sole stockholder of the company, was born in Italy and came to this country at the age of 21, some thirty years ago. He is uneducated, illiterate, unable to speak English correctly. His business had been that of making fireworks. Before 1941, he had had in his employ only a few persons except for a short period each year, when sometimes he had as many as twenty. He and the other defendants had had no experience in the making of products by pressure or in mass production until he received the government contracts, involved in this litigation, which called for the rapid assembling of several millions of bombs and required the employment of about 350 persons. Antonelli was being urged by the government to speed up his work.

Colonel Zanetti, one of the government's witnesses, testified as follows: The machines used in connection with the government contracts did not supply the required pressure automatically. The uniformity of the pressure depended entirely upon the sense of touch or sight of the girls operating the machines. "It was left up to the girl." Experience taught that uniform compression could have been obtained by an automatic process; absent that process, the necessary result could be obtained only by constant inspection. Zanetti said that the type of labor available to Antonelli was not reliable.

2. The following testimony concerning *witness intimidation* is of marked significance, as showing recognition by the government of the weakness of its case:

Costanza testified that Kiefer and other F. B. I. agents had given him to understand that "they would make things easy for him" if he "cooperated with him," and that, "while they could not promise to get me off completely, they would see to it that everything would go easy for me." Beatrice De Filippo, an employee, testified that when interviewed by F. B. I. agents they had assured her that if she would testify in a certain way she would have nothing to fear. John DiRitis testified that he made an engagement with three employees (Lucy Sigilone, Johanna Arone, and Theresa Molinari) to come to the office of one of the defense counsel so that such counsel could interview them in connection with the preparation of the defense; but that when he (DiRitis) called for these witnesses, they

---

of them told the truth. He would be like the editor, described by A. E. Housman, required to select one of two manuscripts, who "cannot but feel * * * that he is a donkey between two bales of hay" and who "imagines that if one bale of hay is removed he will cease to be a donkey." Were I a trial judge sitting in criminal cases, I would often be thankful that the jury removed both bales.

[69] Aristotle, Rhetoric, Book I, Ch. 1. The quotation is from W. Rhys Roberts' translation, reprinted in The Basic Works of Aristotle (McKeon ed., 1941). In this passage, Aristotle spoke of "the judge," but the editor in a note says "the reader should understand 'judge' in a broad sense, including 'jurymen' and others who judge."

See Grote, Greece (1888 ed.) Ch. 46, pp. 465–486, for an interesting discussion of the similarities between the Greek "popular courts" (dicasteries) and our juries. But see Calhoun, Introduction to Greek Legal Science (1944) Ch. V, for criticism of the description of the Greek dicasteries as "juries," for the reasons that (1) members of these courts were well trained and (2) "judged both the law and the facts." The adequacy of that second reason is questionable since our juries, when rendering general verdicts, in actuality have the power to judge the "law" as well as the "facts." See Frank, If Men Were Angels (1942) 82–88.

refused to see the defense counsel because they had been told by Kiefer, an F. B. I. agent, not to do so.[70]

*After this testimony was given, Kiefer who had previously testified, was recalled to the stand by the government, but was not asked any questions concerning it, and in no way contradicted it.*

Johanna Arone, an employee and a government witness, testified on cross-examination, that she had been questioned by representatives of the F. B. I., and that fear of harm that might come to her influenced her to testify against some of the defendants.

Two of the chief government witnesses were Bianchi and Pitio, self-confessed accomplices in the alleged conspiracy. Pitio had a criminal record. In his testimony he admitted that he had told a prospective witness that "if he knew what was good for him, he would get out of this lawsuit and not testify for the defense." Alice La-Brutto testified that Pitio had told her not to testify: her testimony was not contradicted.

I fail to comprehend why my colleagues refer to the testimony, above described, as "trivial stuff" that "deserved the complete ignoring which the government gave it."

## II. *Exceptions made by this Court to its "Harmless Error" Rule.*

In fairness to my colleagues, I must say, as I have said elsewhere,[71] that to their working rule of harmless error, they make these exceptions: (a) when important evidence has been excluded;[72] (b) when the trial judge has given an erroneous charge as to the substantive law;[73] (c) sometimes when the trial judge has been extravagantly unfair;[74] (d) when defendant has been deprived of a basic constitutional right (e. g., to be represented by counsel);[75] (e) occasionally, when the sentence is excessive.[76] But for other types of substantial error—such, e. g., as erroneous admission of evidence or such as that here involved—they refuse to reverse if they think defendant guilty, although the testimony is in conflict.[76a]

## III. *A Judge's Doubts about the Wisdom of the Jury System are not Incompatible with His Obligation to Ensure Fair Jury Trials.*

It has been suggested[77] that a judge (like me) who shares the doubts about the wisdom of the jury system[77a] is inconsistent if he urges that the courts be vigilant in preserving the jury's function. I do not understand that criticism. It is the sworn

---

[70] My colleagues say that DiRitis' testimony was "consistently denied" by Theresa Molinari "under searching cross-examination." The record shows that her answers were not as consistent as my colleagues indicate. When asked whether she had ever been requested to come to the defense lawyer's office, she first answered that she had not, but, after being cautioned that the matter was important, she replied, "I don't remember." As this lack of memory on this subject reappears throughout the cross-examination, her testimony cannot fairly be characterized as "emphatic denial."

[71] United States v. Rubenstein, 2 Cir., 151 F.2d 915, 922, 923.

[72] United States v. Andolschek, 2 Cir., 142 F.2d 503; United States v. Krulewitch, 2 Cir., 145 F.2d 76, 156 A.L.R. 337; United States v. Hoffman, 2 Cir., 137 F.2d 416; cf. Commercial Banking Corporation v. Martel, 2 Cir., 123 F.2d 846.

[73] United States v. Haug, 2 Cir., 150 F.2d 911; United States v. Ausmeier, 2 Cir., 152 F.2d 349; cf. Voltmann v. United Fruit Co., 2 Cir., 147 F.2d 514.

[74] United States v. Marzano, 2 Cir., 149 F.2d 923; but see United States v. Liss, 2 Cir., 137 F.2d 995; United States v. Mitchell, 2 Cir., 137 F.2d 1006 and 2 Cir., 137 F.2d 831.

[75] But see United States v. Gutterman, 2 Cir., 147 F.2d 540; United States v. Mitchell, supra; cf. dissenting opinion in United States v. Pape, 2 Cir., 144 F.2d 778, 783.

[76] Amendola v. United States, 2 Cir., 17 F.2d 529, 530; cf. United States v. Hoffman, 2 Cir., 137 F.2d 416; United States v. Trypuc, 2 Cir., 136 F.2d 900, 902. But see comment in United States v. Rubenstein, 2 Cir., 151 F.2d at page 924 note 20.

[76a] Cases in which "unclaimed" errors are noted by this court are not true exceptions; in such cases, the court does not believe the defendant guilty.

[77] See dissenting opinion in Arnstein v. Porter, 2 Cir., 154 F.2d 464 at 479.

[77a] See note 53, supra.

duty of judges to enforce many statutes they may deem unwise. And so, when on the bench, our private views concerning the desirability of the jury system are "as irrelevant as our attitudes towards bimetallism or the transmigration of souls." [78] Consequently, as long as jury trials are guaranteed by constitutional or statutory provisions, it is the obligation of every judge, no matter what he thinks of such trials, to see that they are fairly conducted and that the jury's province is not invaded. That does not mean that a judge may not freely express his skepticism about the system, may not seek to bring about constitutional and statutory changes which will avoid or reduce what he considers its unfortunate results as it now operates.[79]

---

[78] My dissenting opinion in Keller v. Brooklyn Bus Corporation, 2 Cir., 128 F. 2d 510, 513, at page 517.

[79] For further discussion of this subject, see my dissenting opinions in Keller v. Brooklyn Bus Corporation, 2 Cir., 128 F.2d 510; United States v. Liss, 2 Cir., 137 F.2d 995, at pages 1001, 1002; United States v. Rubenstein, 2 Cir., 151 F.2d 915.